**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.    11-cv-02990-WYD-KLM

SCOTT BURKE, TREVOR CEVENE, MICHAEL CONDENSA, CHAZ FORTUNE,
ROSALYN GRIGSBY, NICHOLAS HRUBY, MICHELLE JACKSON, STEVEN LEVINE,
and MIKAL WILLIAMS

        Plaintiffs,

v.

ALTA COLLEGES, INC., d/b/a/ Westwood College, a Delaware corporation,

        Defendant.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT

---

        This case, arising under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207,

involves a claim for overtime liability against Defendant Alta Colleges, Inc. d/b/a

Westwood College.  A bench trial was held before me on February 2-5, 2015.  Plaintiffs

Scott Burke, Michael Condensa, Chaz Fortune, Rosalyn Grigsby, Nicholas Hruby,

Michelle Jackson, and Steven Levine appeared and were represented by Donna

Dell'Olio of the firm Cornish & Dell'Olio, P.C.[1]  Defendant was represented by William

Ojile of Westwood College and Noah Finkel and Kara Goodwin of the firm Seyfarth

Shaw LLP.

        Prior to trial, the parties stipulated that each Plaintiff has made a *prima facie* case

for overtime liability under the FLSA.  Thus, the sole issue at trial for my determination is

whether Defendant has established exemption from the requirements of the FLSA by

---

[1]     Plaintiff Trevor Cevene was scheduled to testify at the trial via videoconference,
however, he failed to appear.  During the trial, I admitted Plaintiff Mikal Williams'
testimony via deposition, which I carefully reviewed prior to entering this Order.

establishing by a preponderance of the evidence that Plaintiffs' primary duty was "making sales within the meaning of 3(k) of the [FLSA]" as required by 29 C.F.R. § 541.500.  (ECF No. 184).

Having heard and considered the evidence, including stipulated facts, live witness testimony, deposition testimony, admitted exhibits submitted by the parties, counsels' arguments, and the parties' proposed findings of fact and conclusions of law, I now enter the following Findings of Fact, Conclusions of Law and Order of Judgment.

## I.   UNDISPUTED FINDINGS OF FACT[2]

1.    Each Plaintiff has made a *prima facie* case for overtime liability under the Fair Labor Standards Act.  29 U.S.C. § 207.  Specifically:

(a) Alta Colleges, Inc. d/b/a Westwood College is a covered employer subject to Section 7 of the Fair Labor Standards Act;

(b) Plaintiffs, Scott Burke, Trevor Cevene, Michael Condensa, Chaz Fortune, Rosalyn Grigsby, Nicholas Hruby, Michelle Jackson and Mikal Williams were employed by Alta Colleges, Inc. d/b/a Westwood College within two years of the date each filed or joined in this action.  Steven Levine was employed by Westwood within three years of the date he filed his consent to join in this action.

(c) Each Plaintiff worked more than 40 hours during at least one work week during their employment with Alta Colleges, Inc. d/b/a Westwood College and within the applicable statute of limitations; and

---

[2]    The parties submitted these facts through two documents entitled "Stipulations of Fact Concerning Plaintiffs' Prima Facie Case" (ECF No. 184) and "Stipulated Findings of Fact" (ECF No. 158).

(d) Alta Colleges, Inc. d/b/a Westwood College did not pay time and one-half the Plaintiffs' regular rate of pay for hours worked over forty.

2.     Scott Burke is a natural person who resides in El Paso County, Colorado. He was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Admissions Representative from August 23, 2010 until September 20, 2011.

3.     Mr. Burke was paid an annual salary by Alta Colleges of $50,000.00.

4.     Mr. Burke filed his Complaint in this action on November 16, 2011.  Mr. Burke's claim from August 23, 2010 until September 20, 2011 is within the two year statute of limitations.

5.     Trevor Cevene is a natural person who resides in the Los Angeles, California area.  He was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Admissions Representative from on or about April 16, 2012 until January 1, 2013 and worked in Los Angeles.  Mr. Cevene was hired by Westwood on October 17, 2011, as an Assistant Director of Admissions.  On or around April 16, 2012, Mr. Cevene was demoted to the position of Field Admissions Representative for Westwood.

6.     Trevor Cevene filed his consent to join this action on December 3, 2012. Excluding the period when this action was stayed (February 15, 2012 until June 18, 2012- 125 days), Mr. Cevene's claim from April 16, 2012 to January 1, 2013 is within the two year statute of limitations.

7.     Mr. Cevene's annual salary was $70,000.00.

8.     Michael Condensa is a natural person who resides in the Atlanta, Georgia area.  Mr. Condensa was employed by Alta Colleges, Inc. d/b/a Westwood College, as

3

a Field Admissions Representative from November 20, 2007 to on or about January 3, 2009, and again from February 1, 2010 until August 2, 2013.

9.      Mr. Condensa filed his consent to join this action on December 21, 2012. Excluding periods when the action was stayed (February 15, 2012 until June 18, 2012- 125 days), Mr. Condensa's claim from August 18, 2010 to August 2, 2013 is within the two year statute of limitations.  Mr. Condensa's claim from February 1, 2010 to August 2, 2013 is within a three year statute of limitations.

10.      Westwood hired Mr. Condensa to work as a Field Admissions Representative in the Chicago, Illinois area, effective January 3, 2009.  Mr. Condensa transferred to the position of Assistant Director of Admissions for Westwood's Atlanta Northlake Campus.  Mr. Condensa returned to the position of Field Admissions Representative on February 1, 2010.

11.      From February 1, 2010 to September 4, 2010, Mr. Condensa was paid an annual salary of $60,000.00 as a Field Admissions Representative at Westwood.  From September 5, 2010 to December 31, 2011, Mr. Condensa received an annual salary of $62,500.00 as a Field Admissions Representative at Westwood.  From January 1, 2012 to March 10, 2013 Mr. Condensa received an annual salary of $64,500.00 as a Field Admissions Representative at Westwood.  From March 11, 2013 until August 2, 2013 Mr. Condensa received an annual salary of $65,500.00 as a Field Admissions Representative at Westwood.

12.      Chaz Fortune is a natural person who resides in Atlanta, Georgia.  He was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Admissions

Representative from March 21, 2010 until February 14, 2012.

13.     On July 24, 2012, Mr. Fortune filed his consent to join the case of *Antonio Cook v. Alta Colleges*, 12-cv-00804-JOF in the Northern District of Georgia, which was later transferred to the District of Colorado and consolidated with this action.  Mr. Fortune's claim from July 24, 2010 to February 14, 2012 is within the two year statute of limitations.  Mr. Fortune's claim from March 21, 2010 to February 14, 2012 is within a three year statute of limitations.

14.     Mr. Fortune was hired at an annual salary of $40,000.00.  Effective September 5, 2010, Mr. Fortune's salary was adjusted to $44,000.00.  From October 17, 2010 to the end of his employment on February 14, 2012, Mr. Fortune received an annual salary of $48,000.00.

15.     Rosalyn "Kim" Grigsby is a natural person who resides in Atlanta, Georgia.  She was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Case Admissions Representative from August 10, 2009 until December 2, 2011.  On August 11, 2011, Ms. Grigsby began a medical leave of absence and was not actively working as a Field Admissions Representative at Westwood after that date.

16.     Ms. Grigsby filed her consent to join this action on November 30, 2012.  Excluding period when this action was stayed (February 15, 2012 until June 18, 2012- 125 days), Ms. Grigsby's claim from July 28, 2010 to August 11, 2011 is within the two year statute of limitations.  Ms. Grigsby's claim from August 10, 2009 to August 11, 2011 is within a three year statute of limitations.

17.     Ms. Grigsby was first employed as a Field Admissions Representative at

Westwood at an annual salary of $50,000.00.  Effective September 5, 2010, Ms. Grigsby's salary was adjusted to $55,750.00.

18.    Nicholas Hruby is a natural person who resides in Colorado.  He was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Admissions Representative from September 2, 2008 until October 6, 2011.

19.    Nicholas Hruby filed his consent to join this action on November 28, 2012. Excluding the period when this action was stayed (February 15, 2012 until June 18, 2012- 125 days), Mr. Hruby's claim from July 26, 2010 to October 6, 2011 is within the two year statute of limitations.  Mr. Hruby's claim from July 26, 2009 to October 6, 2011 is within a three year statute of limitations.

20.    From September 2, 2008 until October 3, 2010, Mr. Hruby's annual salary was $50,000.00.  Effective September 5, 2010, Mr. Hruby's pay was increased to an annual salary of $55,000.00.

21.    Michelle Jackson is a natural person who resides in the District of Columbia.  She was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Admissions Representative from March 15, 2010 until November 5, 2012.

22.    Michelle Jackson filed her consent to join this action on February 12, 2013.  Excluding the period when this action was stayed (February 15, 2012 until June 18, 2012- 125 days), Ms. Jackson's claim from October 10, 2010 to November 5, 2012 is within the two year statute of limitations.  Ms. Jackson's claim from March 15, 2010 to November 5, 2012 is within a three year statute of limitations.

23.    Ms. Jackson's annual salary from March 15, 2010 until September 5, 2010

6

was $50,000.00.  Her annual salary from September 5, 2010 to November 5, 2012 was $51,000.00.

24.     Steven Levine is a natural person who resides in Chicago, Illinois.  Mr. Levine was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Admissions Representative from February 4, 2008 until March 19, 2010.  He worked in the Chicago area.

25.     Steven Levine filed his consent to join this action on January 25, 2013. Excluding the period when this action was stayed (February 15, 2012 until June 18, 2012- 125 days), Mr. Levine's claim from September 22, 2009 to March 19, 2010 is within a three year statute of limitations.

26.     When Mr. Levine was hired on February 4, 2008, he was paid an annual salary of $50,000.00.  As of September, 2009, Mr. Levine's annual salary was $53,000.00.

27.     Mikal Williams is a natural person who resides in the District of Columbia. He was employed by Alta Colleges, Inc. d/b/a Westwood College, as a Field Admissions Representative from January 4, 2010 until August 5, 2011.

28.     Mikal Williams filed his consent to join this action on March 5, 2013. Excluding the period when this action was stayed (February 15, 2012 until June 18, 2012- 125 days), Mr. Williams's claim from October 31, 2010 to August 5, 2011 is within the two year statute of limitations.  Mr. Williams's claim from January 4, 2010 to August 5, 2011 is within a three year statute of limitations.

29.     Mr. Williams's annual salary from January 4, 2010 until September 5,

7

2010 was $48,000.00.  From September 5, 2010 to August 5, 2011, Mr. Williams's annual salary was $50,000.00.

30.     The Defendant, Alta Colleges, Inc. d/b/a Westwood College, is a Delaware corporation authorized to do business in the State of Colorado.

31.     At all times relevant to the Complaint the Defendant corporation was an enterprise engaged in commerce within the meaning of the federal Fair Labor Standards Act (29 U.S.C. § 203 (s)(1)) with gross sales of more than $500,000.00 per year.

32.     Westwood College is a for-profit education company providing education to high school graduates and working adults.  Westwood College is headquartered in Denver, Colorado, and maintains an online campus and 14 campuses across California, Colorado, Georgia, Illinois, and Virginia, offering degree programs in fields such as technology, healthcare, business, design, justice, and industrial services.

## II.     ADDITIONAL FINDINGS OF FACT

### A.  Westwood's Field Admissions Representative Position and Corresponding Policies and Practices

1.     Westwood attracts and persuades students to enroll and attend its school through various means, including advertising and speaking directly to high school students and other prospective Westwood students.

2.     Three types of Westwood employees are tasked with working with prospective students to inform and persuade them to enroll in Westwood's educational programs and services:  (1) Online Admissions Representatives for Westwood's online program; (2) Campus Admissions Representatives for Westwood's campus-based

programs; and (3) Field Admissions Representatives who have the same responsibility as Campus Admissions Representatives but who work from outside Westwood's campuses, primarily at high schools and in the homes of prospective Westwood students.

3.      Only Field Admissions Representatives are the subject of this lawsuit.

4.      The primary role of Westwood's Field Admissions Representatives is to selectively prospect, interview, recommend, and enroll individuals into one of Westwood's career-focused education programs and guide the prospects through the enrollment completion process.  Field Admissions Representatives generally are responsible for enrolling current high school students to attend Westwood after those students graduate from high school.

5.      Field Admissions Representatives report to a Director of Admissions.

**B.  The Hiring Process for Field Admissions Representatives**

6.      When hiring Field Admissions Representatives, Westwood typically looks for an individual with prior sales experience, among other things.  However, prior sales experience is not always required.

7.      Westwood posts available Field Admissions Representative positions in local newspapers and on Internet sites such as CareerBuilder.com and Monster.com under the categories of "Sales," "Education," and "Customer Service."  Posted ads for Westwood's Field Admissions Representative position emphasize the need for sales experience to perform the job and specifically state that qualified applicants for the position must have at least "1+ Year of Goal Oriented Sales or Related Experience."

8.      During interviews of candidates for the Field Admissions Representative position, Westwood evaluates the competencies of the candidates and whether they can effectively represent Westwood's educational programs and services to prospective students.

### C. Field Admissions Representative Training

9.      Shortly after a Field Admissions Representative is hired to work at Westwood, he or she will attend a multi-day training program in Denver, Colorado or Chicago, Illinois.  During this training, Field Admissions Representatives learn about, among other things:  (a) Westwood's "product," namely its educational programs and services, (b) developing leads, (c) territory development and management, (d) suggested dialogue for various aspects of the job, (e) tools to gain commitment from prospective students, (f) finalization and closing techniques, i.e., ways of identifying and overcoming student objections, and (g) follow-up steps to prepare students to start school at Westwood.

10.     As part of Westwood's training program, Field Admissions Representatives receive a manual called "The Book of Knowledge" along with a workbook and access to online learning modules.  In addition to receiving a hard copy, Westwood makes an electronic copy of the Book of Knowledge accessible online to all Field Admissions Representatives.

11.     The Book of Knowledge and online learning modules provide basic training and instruction on how Field Admissions Representatives should interact with

10

prospective students, perform key job responsibilities, conduct student presentations, and use the systems and tools provided by Westwood.

12.    The Book of Knowledge instructs Field Admissions Representatives on methods to overcome objections, lead development, territory management, booking high school presentations, finalization techniques, and sales techniques.

13.    In addition to their initial training, Field Admissions Representatives undergo additional training throughout their employment regarding methods to overcome prospective student objections, territory development and management, and finalization techniques.

14.    Westwood's training program and Book of Knowledge manual are designed to help a Field Admissions Representative understand the totality of the Westwood admissions process, and ultimately maximize the number of qualified individuals the Field Admissions Representative enrolls and assists in starting school at Westwood.

15.    In June 2010, Westwood launched a new web-based admissions presentation, called "College U."  Designed to replace the PowerPoint admissions presentation historically used by Westwood, College U automatically customizes by campus and program and allows the Field Admissions Representative and prospective student to view the presentation on a computer screen.  The web-based nature of the presentation allows for centralized control over modifications, ensuring that prospective students get the most accurate and up-to-date information about Westwood.  The presentation links to the Westwood website, catalog, and other disclosures that can be

opened and reviewed with the prospective student to illustrate points during the presentation and respond to questions.  College U also contains an extensive Coaching Overlay that assists the Admissions Representative in responding to questions and contains required language on key disclosures.

16.     All Admissions Representatives were trained on College U in June 2010 and again in August or September 2010.  Rick Yaconis, President and Chief Marketing Officer of Alta Colleges, conducted the training on College U at both meetings.

17.     In August 2010, use of College U became mandatory for Admissions Representatives in conducting admissions interviews.

18.     In the foregoing June training introducing Admissions Representatives to College U, a focal point was the "higher level of sophistication" required from the Admissions Representatives, including changes in terminology:

- Must differentiate ourselves from competition
- Must represent an institution of higher learning
- Must enhance our vernacular
  - Old: Trial Close              New: Student Confirmation
  - Old: Sales Week              New: Admissions Week
  - Old: Close                      New: Gain Student Commitment
  - Old: Explain the cost        New: How to Pay for College
  - Old: Nine Steps              New: College U

19.     Admissions Representatives were shown how College U replaced, but covered the same ground as, the nine-step interview process upon which most Admissions Representatives had previously been trained.  A core concept of the previous nine-step interview process was the "funnel effect," which presented decisions

to a prospective student in the form of 5 "trial close" questions and a "summary close." In College U, the "funnel" was re-cast as a pyramid containing four questions, the last of which was "Do you see how Westwood College is a place where you can succeed?", with the apex of the pyramid stating "Westwood as your choice to pursue education."

20.   A goal in developing College U was to enhance student commitment to enroll in school and to improve student start rate, which is the percentage of student applicants who start school and attend for the first 14 days of the student's first term. The College U training focuses on how Admissions Representatives gain and confirm student commitment to enroll in and start school.

21.   Members of the Atlanta Field Admissions team, including Plaintiffs, attended a regional training meeting in Virginia on September 15-16, 2010.

22.   At the September 2010 training, the importance of gaining student commitment to enroll in the College was reinforced to Admissions Representatives. Admissions Representatives were trained on the "3 Ps" of Enhancing Commitment:

- "Preparing" the student in the interview;
- "Presenting" each step of the interview and understanding the process; and,
- "Professionalism" of the Representative and all team members who interact with the student.

23.   Another purpose of the September 2010 training was to reinforce the "boundary" between admissions and financial aid.  Admissions Representatives were told that they could provide prospective students facts about the financial aid process, but that they could not offer any opinions on a prospective student's eligibility for financial aid or coach prospective students on how to respond to questions or issues in

the financial aid process.

24.     In another portion of the training, the Presentation Guidelines and Ethical Responsibilities were reviewed.  The Presentation Guidelines and Ethical Responsibilities were standards regarding the prospective student interview and presentation that Admissions Representatives were required to follow in every student communication.  These standards included that the Admissions Representative would accurately represent Westwood's accreditation, would not guarantee transfer of credits to or from other institutions, and would only use approved salary information.

25.     At no time were Admissions Representatives told that they needed to follow College U verbatim or risk separation.  Rather, the College U Coaching Overlay provided the following guidance:

> The Coaching Overlay is a tool used to guide the College U presentation with prospective students.  When used properly, it will provide the prospective student with the information needed in order to make an informed decision about college. **Note that areas indicated by a shaded box are key messages of the Coaching Overlay and are required to be covered with all prospective students.**  The Coaching Overlay does not need to be read verbatim, but instead should be used in a conversational manner while, at the same time, accurately delivering all key messages.

### D. Westwood Field Admissions Representatives Work With Minimal Supervision

26.     Field Admissions Representatives do not have offices on Westwood's premises, but rather work in the field, including at high schools and in homes of prospective Westwood students.  Certain of Westwood's campuses may have an empty office that Field Admissions Representatives can use when on campus following up with a student during the enrollment completion process or on the student's first day of class.

14

27.     Field Admissions Representatives generally manage their own day-to-day activities.  Field Admissions Representatives are not required to work predetermined days and hours, but rather set their own schedules.

28.     Field Admissions Representatives participate in a weekly teleconference with their managers and other team members to make progress reports, troubleshoot ideas, and discuss team issues.  Depending on the management style, Managers may have more frequent contact throughout the week with Field Admissions Representatives.

### E. Field Admissions Representatives Generate Leads Through High School Presentations

29.     Field Admissions Representatives are responsible for generating the majority of their own leads.  Typically, Field Admissions Representatives are assigned a specific territory in which to generate leads for Westwood's educational programs and services to student candidates.  A Field Admissions Representative's success depends upon identifying qualified individuals and convincing them to enroll at Westwood, attend school, and pay tuition.

30.     The first step in accomplishing this goal is to make contact with high schools, where the Field Admissions Representative generates a majority of his or her leads.

31.     The Field Admissions Representative first schedules an appointment to talk with high school administrators or teachers.  The purpose of this meeting is to educate the educators regarding Westwood's programs and services and to set a time to conduct the high school presentation.  This is commonly referred to as "booking" the

high school.  This is also an opportunity for the Field Admissions Representative to build his or her territory and to establish relationships with the high school teachers and administrators who, in turn, are likely to refer students whom they believe would benefit from Westwood's educational programs.

33. Once the Field Admissions Representative books the high school, he or she presents Westwood's career workshop to high school students.  The workshop starts with an interactive presentation aimed at motivating students to think about the benefits of higher education and then discusses Westwood and the specific programs offered by Westwood.

33. After the presentation, the Field Admissions Representative hands out what Westwood calls Career Interest Cards, and asks the students to provide general contact information, answer questions regarding their career interests and college plans, and state whether they are interested in more information about Westwood.  At the end of the workshop, the Field Admissions Representative collects the Career Interest Cards and answers any questions the students may have about Westwood.

### F. Field Admissions Representatives Develop Leads From Career Interest Cards

34. The Career Interest Cards that a Field Admissions Representative collects during a high school presentation serve as an important means of lead generation.  It is from the Career Interest Cards that a Field Admissions Representative will first consider whether a student is a candidate likely to apply and attend school at Westwood.

35. If, from the Career Interest Card, the Field Admissions Representative determines that a student is not interested in one of Westwood's programs, the Field

Admissions Representative is not likely to pursue that student.

36.     Once the Field Admissions Representative decides that a student appears to be a candidate likely to apply and attend school at Westwood, he or she calls that student to confirm that the student has a genuine interest in a Westwood program and is likely to qualify for that student's program of choice.

37.     If the Field Admissions Representative is convinced that the student is a sincere prospect, the representative will ask to speak with the student's parents to schedule a home interview.

### G. The Home Interview and Obtaining the Application

38.     At the home interview, the Field Admissions Representative meets with the student and his or her parent(s) or any other person who is necessary to the student's decision to attend Westwood.  The Field Admissions Representative then proceeds through an hour-long interview using Westwood's interview presentation and profile questionnaire.

39.     Although Westwood provides an admissions presentation to guide the home interview, Field Admissions Representatives do not simply recite a script.  Rather, Field Admissions Representatives are expected to engage in conversation with the prospective student, his or her parent(s), and other person(s) necessary to the student's decision to determine the student's educational needs and career interests and then tailor the message and presentation based on those needs and interests.

40.     A Field Admissions Representative makes numerous decisions during the course of the home interview and exercises judgment to determine what technique,

method, or message the Field Admissions Representative believes will be most persuasive to encourage the prospective student to apply and attend school at Westwood.  In addition, Field Admissions Representatives must use their judgment to determine how to address concerns or obstacles that may prevent the prospective student from attending Westwood.

41.     At the end of the home interview, the Field Admissions Representative determines whether the student is interested in and would be a good fit for Westwood and whether the student has the family support necessary to attend and succeed at Westwood.

42.     If the Field Admissions Representative believes that the student is a candidate likely to apply and attend school at Westwood and the student is interested in a program offered by Westwood, the representative explains the enrollment documents, assists the student in completing them, and collects the application fee, if applicable, which has varied between $50.00, $25.00, and $0 during the relevant time period.

43.     The representative then provides the student with a checklist and discusses the various tasks that must be completed to start school at Westwood.

44.     Student applicants are asked to complete what Westwood calls a "Letter of Intent" within 72 hours of submitting an application.  The Letter of Intent is addressed to the Field Admissions Representative and provides information as to why the student wants to attend Westwood.  Field Admissions Representatives will refer back to the Letter of Intent if the student later wavers in his or her commitment to attend Westwood.

45.     Since 2011, at the time of application or anytime thereafter, students are informed that based upon their performance in school they may be eligible for Westwood's "Employment Pledge."  The Employment Pledge states that if the student has good class attendance and maintains certain grade requirements, but is unable to find employment within six months of graduation from Westwood in the student's field or a related field, Westwood will pay the student either $500 or $250 (depending on whether the student earned a bachelor's or associate's degree) per month until the student secures employment.

**H. Westwood's Objective Admissions Requirements**

46.     Westwood's admissions requirements are objective.

47.     If a student satisfies Westwood's objective criteria, meaning that the student (1) participated in an interview with an admissions representative and completed the application documents; (2) paid the application fee, if applicable; (3) satisfied the "education verification" requirement by presenting a high school diploma or GED; and (4) meets Westwood's "educational proficiency" requirement by achieving a particular ACT/SAT score or demonstrating previous college credits, the student is automatically admitted.

48.     There is no individual, board, group, or committee at Westwood making decisions as to whether to accept any particular student for admission to Westwood.

49.     If the student does not meet Westwood's ACT/SAT requirement or have previous college credits, the student has two chances to meet the education proficiency requirement by passing a college entrance assessment, which measures whether the

19

student is ready for college-level work.  If the student achieves a passing score on the assessment, the educational proficiency requirement is satisfied and the student is automatically admitted (if the student has otherwise satisfied the admissions criteria).

### I.   Field Admissions Representative Follow-Up Activities

50.    Obtaining a student application is only the start of the process of encouraging students to actually attend school at Westwood and ultimately to pay tuition.  A Field Admissions Representative often will obtain an application from a prospective student in August, September, or October, but the student will not start at Westwood until the following August.

51.    During this "long sales cycle" between when a Field Admissions Representative obtains an application from a prospective student and when the student is scheduled to start at Westwood, it is critical that the Field Admissions Representative stay in contact with the prospective student, ensure that the student is completing the steps necessary to start school at Westwood, and maintain that student's interest in Westwood and its educational program so that the student does not change his or her mind about attending Westwood.

52.    As part of the follow-up process designed to ensure that students start school at Westwood, upon obtaining an application from the prospective student, the Field Admissions Representative follows up with the applicant to make sure he or she satisfies the education proficiency requirement for admission.

53.      If the student applicant does not meet Westwood's ACT/SAT requirement, the Field Admissions Representative works to ensure that the student applicant completes the college entrance assessment within one week of the application.

54.      The Field Admissions Representative contacts the student and/or the parents to schedule the assessment, which typically takes place on campus and is administered by the Student Services department.  If the assessment is not going to take place on campus, the Field Admissions Representative is responsible for securing a location and finding a proctor to administer the assessment.

55.      The Field Admissions Representative makes reminder telephone calls to ensure the student applicant is present and takes the scheduled assessment.

56.      The Field Admissions Representative also contacts the student and/or parents to schedule financial aid meetings.  The Field Admissions Representative typically calls to remind the student of the financial aid meeting and is often on campus when the student arrives to make sure the student is in the right place for the meeting.

57.      Because most Field Admissions Representatives obtain applications from current high school students, the Field Admissions Representative is responsible for ensuring the student applicant satisfies the education verification admissions requirement by providing a copy of the student's diploma or proof of graduation once the student graduates from high school.

58.      Westwood recommends that each student applicant participate in a campus tour, which provides an opportunity for the student to tour the campus, meet the head of their program, and meet the Westwood campus president.  The Field

Admissions Representative works with the student and on-campus personnel to organize the tour and often personally conducts the student's campus tour.

59.     Although student applicants interact with various individuals and departments during the enrollment completion process, the Field Admissions Representative is the primary source of contact for the student and is responsible for ensuring that the student completes the necessary steps to start school at Westwood.

60.     Westwood's student support team member or department is responsible for communicating to the Field Admissions Representative the results of the assessment, financial aid status, or any other pertinent information so that the Field Admissions Representative knows at all times where the student is in the enrollment completion process.

61.     As part of the enrollment completion process, the student participates in a pre-registration activity or orientation event.  The purpose of these activities is to have the student applicant come to campus, meet other students and staff, tie up any loose ends or finish any outstanding paperwork, and ensure that the student has met all of the admission requirements.

62.     Field Admissions Representatives inform their student applicants of the pre-registration activities or orientation events and follow up to make sure their students plan to attend.

63.     A student applicant also attends a "Day One Success Class," which helps the student learn how to adjust to attending college.

64.     Throughout the enrollment completion process, the Field Admissions Representative stays in contact with the student applicant to answer questions and overcome any concerns or obstacles that may arise, so that the student meets the admission requirements and starts school at Westwood.

65.     In the weeks before school starts, the Field Admissions Representative connects with prospective students to resolve any last-minute concerns, reassure wavering students, and make sure the family is preparing for the start of school.

66.     Field Admissions Representatives greet their students on campus for the first day of class and remain in contact with the students to address any concerns that may arise.

67.     It is only after the student has attended class for two weeks[3] that the student officially becomes a "start" and incurs a financial obligation to Westwood for tuition.

68.     The Field Admissions Representative must use discretion to determine, based on the individual student applicant, what method and manner of follow-up will be most persuasive in guiding the student through the enrollment completion process and making sure the student completes the necessary steps to start school at Westwood.

**J.  Field Admissions Representative Compensation Structure**

69.     Field Admissions Representatives are paid an annual salary.

70.     Before October 2010, and consistent with the United States Department of Education rules then in effect, Westwood paid its Field Admissions Representatives a

---

[3]     In 2012, this period of time was changed to 30 days.

base salary as well as a bonus based on "retention and completion" of students. Bonuses were paid out to Field Admissions Representatives five times per year and were based in part on the number of qualified students the Field Admissions Representative enrolled.

71.     In October 2010, Westwood discontinued the use of retention and completion bonuses in anticipation of revised federal regulations governing the compensation of admissions representatives that specifically prohibited the payment of commissions or bonuses for the retention and completion of students.

72.     The Department of Education's new regulations regarding the ban on incentive compensation, which went into effect on July 1, 2011, require that an institution accepting Title IV funds:

> not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds.

34 C.F.R. § 668.14(b)(22)(i).

73.     The Department of Education's new regulations defined "commission, bonus, or other incentive payment" to mean "a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or entity for services rendered." 34 C.F.R. § 668.14(b)(22)(iii)(A).

74.     The Department of Education's new regulations defined "securing enrollments" in part to mean "activities that a person or entity engages in at any point in

time through completion of an educational program for the purpose of the admissions or matriculation of students for any period of time." 34 C.F.R. § 668.14(b)(2)(iii)(B).

75.     Each Westwood Admissions Representative, including Field Admissions Representatives, received a transition letter in October 2010 showing how his or her current compensation, both base salary and bonus, would be translated into a revised base salary that went into effect upon the discontinuation of incentive compensation.

76.     If the Admissions Representative was receiving retention and completion bonuses, Westwood took those amounts into consideration in determining the Admissions Representative's revised base salary.

77.     Prior to 2012, in addition to their base salaries, Field Admissions Representatives also received a stipend for each high school presentation made and each admissions interview conducted.  These were paid to the Field Admissions Representatives in their bi-weekly paychecks based upon activities reported in their weekly activity reports.

**K.  Field Admissions Representative Performance Evaluation**

78.     Since at least January 2009, Field Admissions Representatives have been evaluated annually.

79.     At all relevant times Admissions Representatives were required to meet published performance standards.  The Admissions Representatives' performance against these standards was regularly reviewed, and failure to meet minimum standards subjected the Admissions Representative to discipline, including probation and

termination.  The standards of performance periodically were revised throughout the

relevant time period for this action.

80.     Specific performance expectations were published for Field Admissions

Representatives, including:

- Standards of performance measuring the following: start rate (the percentage of applicants who started school and were still in school after the first 14 days of their first term), appointments per week, interviews per week, high schools lectured per week, high school classes lectured per week, productivity (number of applications) per week, representative generated leads (RGL) per week, percentage of applicants accepted, and percentage of applicants who had progressed to a certain stage of the financial aid process.

- Monthly volume standards (number of applications) with monthly volume expectations differing by levels/job titles.

- Start expectations per term and differing by levels/job titles.

- Minimum performance guidelines by field territory (A, B or C) measured start rate, weekly productivity, weekly RGL productivity, percentage of applicants accepted, percentage of applicants packaged for financial aid, starts per term, total annual starts and career interest cards received per week.

81.     Westwood's October 2010 change in Admissions Representative

compensation to discontinue incentive compensation did not change the fundamental

role of the Admissions Representative:  to selectively prospect, interview, recommend,

and enroll individuals into one of Westwood's career-focused education programs and

guide prospects through the enrollment completion process, including starting and

attending school past the first 14 days of the student's first term.

82.     At the same time Westwood discontinued incentive compensation,

Westwood published new performance standards on October 16, 2010.

83.     The same items were measured in the October 2010 performance standards as had been measured in previous iterations, and additional categories of measurement were added such as student retention.  Numeric goals changed in some instances.  For volume and start expectations, the October 2010 performance standards provided a single goal per level/job title and period, rather than a range of outcomes.  In all cases the October 2010 metrics were within the ranges set forth in the pre-October 2010 standards.  Minimum performance guidelines measured the same categories in October 2010 as in previous iterations, but some metrics, such as annual starts, were reduced in the October 2010 minimums.

84.     The performance standards for Admissions Representatives were modified in 2011 and 2012, but continued to maintain the same basic construction: standards of performance; volume standards; start expectations; and minimum performance guidelines.

**L.  Westwood Classified Field Admissions Representatives As Exempt**

85.     Westwood created the position of Field Admissions Representative in or about 1997.  At the time, Westwood understood it was industry standard for for-profit educational companies like itself to classify the Field Admissions Representative position as exempt.  Thus, Westwood classified its Field Admissions Representatives position as exempt.

86.     In 2002, the exempt classification of Westwood's Field Admissions Representative position was challenged in a lawsuit in the United States District Court for the Central District of California, *Mark Cuvillier, et al. v. Alta Colleges, Inc. et al.*,

Case No. 02-935.  During the course of that lawsuit, Westwood reviewed the position and sought the opinion of legal counsel regarding the position's exempt status classification and determined that the position was properly classified as exempt.  The court in *Cuvillier* agreed, and in November 2003, granted Alta Colleges Inc.'s motion for summary judgment, holding that the Field Admissions Representative plaintiffs qualified for the FLSA's outside salesperson exemption.

87.     Westwood's classification of Field Admissions Representatives as exempt employees was again challenged in late 2003, this time in the Western District of Texas in a case titled *Kari Edwards v. Alta Colleges, Inc.*, Case No. 03-cv-00538.  On January 28, 2005, the court in *Edwards* reinforced Westwood's determination that the position was properly classified as exempt when it granted in part Alta Colleges Inc.'s motion for summary judgment and noted that the plaintiffs' duties as a Field Admissions Representative constituted outside sales.

88.     According to the trial testimony of Westwood's Vice President of Human Resources, Evelyn Falk, from 2007-2010, the Field Admissions Representative position was classified as exempt in Westwood's: (1) job descriptions; (2) payroll system; (3) human resources information system; and (4) recruiting posting system.

89.     In the Spring of 2013, Falk became aware of a 2010 Westwood job description for the Field Admissions Representative position that stated that the position was nonexempt.  Trial Ex. 1.  Falk testified that she recognized the classification error and immediately changed the description to read exempt.  This erroneous job description was initially posted on the Westwood internal intranet site in October of 2010

28

and remained there until Falk corrected it in 2013.  Only internal Westwood applicants saw this job description, and according to Falk, a "few" people internally applied for this position, but she never received any complaints that applicants were surprised or confused to learn that the Field Admissions Representative position was classified as an exempt position.

### M. Relevant Experience of Each Plaintiff as a Westwood College Field Admissions Representative

**Scott Burke**

90.     Scott Burke was employed by Westwood as a Field Admissions Representative from August 23, 2010 to September 20, 2011.

91.     Burke admits that the Field Admissions Representative job posting he viewed online described the position as "Field Sales," was posted in the "Sales" category, and required at least 1-3 years of outside sales experience.

92.     Based on the resume Burke submitted to Westwood, he had the prior sales experienced required for the Field Admissions Representative position.

93.     Burke admits he understood that the primary role of a Field Admissions Representative was to selectively prospect, interview, recommend and enroll individuals into a qualified career focused education program and guide the prospect through the enrollment process.

94.     On or about August 9, 2010, Burke received an offer from Westwood for "the full-time exempt position of Field Admissions Representative" at a starting salary of $50,000 a year.

95.     On his first day of employment, and before attending new hire training, Burke received a copy of Westwood's Book of Knowledge.

96.     Burke attended a one-week training program for Field Admission Representatives in Denver, Colorado, from Monday, September 13, 2010, through Friday, September 17, 2010.

97.     Through the Book of Knowledge and formal training, Burke learned about, among other things:  Westwood's educational programs and services, the five key responsibilities for the successful admissions representative, how to make student presentations, the interview process and how to interact with prospective students, tools to gain commitment from prospective students, territory development, lead management, and effective follow-up.  Burke was also provided various sales articles in the Book of Knowledge.

98.     Burke also learned how to overcome objections from prospective students, namely, how to determine the student's true concern or objection and then alleviate or overcome that concern or objection.  Burke also had knowledge from his past sales experience about how to overcome objections.

99.     Burke was also trained on lead development.

100.    Burke had experience developing leads from his previous sales jobs and considered a potential lead as a student in the classroom who is potentially interested in furthering his or her education.

101.    Burke did not have an office on Westwood's campus, but rather, worked in the field, including at high schools and in homes of prospective Westwood students.

102.    From August 2010 to March 2011, Burke was supervised by Senior Director of Admissions Steve Cain.  Burke admits that he had infrequent communications with Steve Cain.

103.    After Cain, Burke reported to Assistant Director of Admissions Robert DeValle and then Rick Hurley.  DeValle and Burke spoke during a weekly team teleconference and a weekly one-on-one phone meeting.  DeValle observed Burke conduct one high school presentation and one telephone interview.

104.    Burke and Hurley spoke twice a week and typically exchanged emails a couple times a week.

105.    As a Field Admissions Representative, Burke was assigned a specific territory in the Mountain Region.

106.    Burke admits that, as a Field Admissions Representative, he was responsible for building and penetrating his territory.

107.    Burke admits that building a territory was something he had done in his previous sales jobs and he understood it meant talking with potential clients or customers in his assigned territory and maintaining relationships.

108.    Burke admits that he was responsible for developing his own leads and that he generated the majority of leads from his high school presentations.

109.    Before Burke could make high school presentations and generate leads, he first had to book the high schools.  To do so, Burke scheduled a meeting and

attempted to develop a relationship with high school counselors and teachers.  During the meeting, Burke explained Westwood's programs and services, discussed his presentation, and asked for a time to make the presentation to high school students.

110.    After booking the high school, Burke made his presentation to high school students.  During the presentation, Burke talked about the educational programs and services offered by Westwood.

111.    At the end of the presentation, Burke handed out Career Interest Cards and asked students to provide contact information if they were interested in any of the programs Burke discussed.

112.    Burke admits that the Career Interest Cards he collected after high school presentations were his leads — students who were potentially interested in attending Westwood.

113.    Burke prioritized the Career Interest Cards he collected from his high school presentations and called students at home to determine whether they had a genuine interest in a Westwood program.

114.    If Burke determined that the student was genuinely interested in Westwood, he asked to speak with the student's parents to schedule a home interview.

115.    At the home interview, Burke met with the student and his or her parent(s) for an hour or an hour and a half to walk through Westwood's laptop presentation and provide additional information on Westwood's programs and services, answer questions the student and/or parent(s) had, and provide information on the additional steps necessary to start school at Westwood.

116.    Burke used the home interview to determine if the student would be a good fit for Westwood.  To do so, Burke asked questions to discover the needs and concerns of the prospective student, evaluated the student's interests, determined if the student was likely to meet Westwood's objective admission standards, considered family preparedness and support for the student attending college at Westwood, and determined which program matched the prospect's interests.

117.    If Burke determined that the prospective student would be a good fit for Westwood, he assisted the student in completing the online application and collected the application fee, if applicable.

118.    Burke admits that as a Field Admissions Representative, it was his job to guide the prospective student through the enrollment completion process up to and including active attendance at school.

119.    Burke admits that his ultimate goal was to find students who would start school at Westwood, get them to attend and, thus, pay tuition.

120.    Burke admits that Westwood only made money when the student enrolled, became engaged in school, and ultimately paid tuition.

121.    Burke described the enrollment completion process as including everything after the student signed the application such as testing, financial aid, campus tour, pre-registration activities, registering for classes, and actually starting class.

122.    Burke admitted that it was his job responsibility to guide a student through that enrollment process.

123.    After submitting an application, and unless the student applicant earned a certain score on the ACT/SAT, Burke contacted the student to inquire whether the student scheduled a time to take his or her assessment.

124.    Burke was informed whether the student passed or failed the assessment. If the student achieved a certain score on the assessment, then the student met the minimum objective requirements for admission at Westwood.  If the student did not pass the assessment, Burke contacted the student to help schedule another appointment for the student to retake the assessment.

125.    Burke followed up with student applicants to assist them in scheduling financial aid appointments.  If a student applicant missed a financial aid appointment, Burke would alert the student and encourage him or her to schedule another appointment.

126.    Burke admits that lead development, phone contact, and obtaining applications were useless activities without effective follow up because the follow up activities were designed to lead to an actual start.

127.    Burke admits he understood that he would receive the same salary regardless of whether he worked more than 40 hours in a week or less than 40 hours in a week.

128.    Burke admits that during his employment as a Field Admissions Representative, he was evaluated based on certain standards of performance, including his number of high schools lectured per week, number of Career Interest Cards

collected per week, number of interviews per week, number of applicants per week, and student start rate.

129.   The minimum performance guidelines for Burke as a Field Admissions Representative considered the rate in which his applicants actually started school at Westwood (and remained in school for at least two weeks).

### Steven Levine

130.   Steven Levine ("Levine") was employed by Westwood as a Field Admissions Representative from February 2008 to March 2010.

131.   Under the terms of his employment, Levine understood that he would receive a starting salary of $50,000 a year regardless of how many hours he worked.

132.   As part of his training, Levine met with each of Westwood's program directors so that he fully understood the programs Westwood offered and could convey that information to prospective students.

133.   Levine did not have an office on Westwood's campus, but rather worked in the field in the homes of prospective Westwood students.

134.   Levine spent the majority of his time each week on home visits with prospective students and traveling to and from those home visits.

135.   Levine was required to submit to his manager on a weekly basis an end of week report that detailed the number of hours spent on the telephone, appointments, interviews, applications, follow-up calls, and revisits he completed that week.  Levine testified that weekly reports were how he showed his manager he was actually working

because he was out in the field working without supervision and did not punch a time clock.

136.    Levine was assigned a territory in Illinois and worked to enroll students at three different campuses in the Chicago area.

137.    Unlike the majority of Field Admissions Representatives, Levine did not book high schools, make high school presentations, or collect Career Interest Cards. Rather, Levine received from Westwood contact information for prospective students who had expressed interest in attending Westwood after seeing a commercial or advertisement.  Levine testified that he was the only Field Admissions Representative who performed this role.

138.    Levine admits he generated his own leads by (1) contacting previous student applicants who did not progress through the enrollment completion process and start class at Westwood and (2) revisiting students who had showed an interest in Westwood but did not submit an application to see if their circumstances or interests may have changed.

139.    After Levine received contact information for a prospective student who expressed interest in Westwood, he called the prospect to conduct a brief phone interview to confirm interest in Westwood and to set up a home interview.

140.    At the home interview, Levine met with the prospective student.  Many of Levine's prospective students were adults so there was no need for him to meet with the prospective student's parents.

141.   Levine's typical home interview lasted two to three hours.  Levine stated that much of each home visit was dedicated to having a conversation with the prospective student.  That conversation consisted of asking and answering questions so that Levine could determine if the student was genuinely interested in Westwood's programs and was committed to enrolling and becoming a student at Westwood.

142.   Levine admits that in every home interview he discussed the prospective student's concerns, hurdles, or obstacles to becoming a student at Westwood and attempted to overcome or resolve them.

143.   During the home interview, Levine asked in-depth questions and took notes to create a profile sheet that he could use to remind his students why they were initially interested in a particular program at Westwood.

144.   Levine admits that his goal as a Field Admissions Representative was not just to get as many applications and application fees as possible.  Levine agreed that an application means nothing if the student does not actually start attending school at Westwood.  Levine attempted to get an application from an appropriate student who was interested in a program Westwood offered and who was committed to becoming a student at Westwood.

145.   If Levine determined that the student was genuinely interested and committed to becoming a student at Westwood, he assisted the student in completing the application and collected the application fee, which was called "stitching in."

146.   Levine admits that his job as a Field Admissions Representative did not end with the student application.  Levine agreed that his job was "not even close" to being complete after obtaining the student application.

147.   Levine admits that his primary role as a Field Representative was to selectively prospect, interview, recommend, and enroll qualified students into a career-focused Westwood education.  To do so, Levine had to guide the prospect through the enrollment completion process up to and including active attendance at Westwood.

148.   The enrollment completion process included the necessary paperwork, placement evaluation or assessment, financial aid, orientation activities and registration, and actually starting class at Westwood and incurring responsibility for paying tuition by attending classes for two weeks.

149.   Guiding students through the enrollment completion process is what Westwood calls "stitching-in" — one of Levine's key responsibilities as a field representative.

150.   Levine motivated and guided his prospective students through every step of the enrollment completion process.

151.   Levine's students often started class just ten weeks after submitting an application.  Levine was in contact with his students each week of the "stitching-in" or enrollment completion process.

152.   After obtaining an application from a prospective student, Levine contacted the student applicant to schedule the assessment.  Levine guided the student

in scheduling and attending the assessment test and made sure the student attended his or her financial aid appointment.

153.   Levine was frequently on campus when the student came for testing. Levine also worked with the student to ensure he or she met Westwood's objective education verification admissions requirement by submitting a copy of the student's transcript or proof of high school graduation.

154.   Often Levine saw his student's motivation start to drop after the student had been admitted but before the student had started class.  Thus, Levine would arrange for the student to come on campus and meet with the program director or a teacher to re-energize and re-motivate the student.  Levine was often on campus to attend the meeting with the student.

155.   During the stitch-in process, Levine revisited the student at home to have face-to-face interaction, answer questions or resolve concerns, recommit the student to the next step in the enrollment completion process, and remind the student why he or she wanted to attend Westwood.

156.   On his students' first or second day of class, Levine was frequently on campus to greet his students.

157.   Levine agreed that even after the student started school at Westwood, it was important for him to stay involved because it was only after the student attended class for 14 days that he or she would officially be considered a "start."  During that two week period, Levine made follow-up calls with students and was on campus meeting

face-to-face with students to answer any questions and resolve any issues, concerns, or problems.

158.   Levine testified that as a Field Admissions Representative he was held to the same pressures of commissioned salespeople and that Westwood pressured its Field Admissions Representatives to meet numbers, meaning that they had to achieve a certain number of students who started school at Westwood.

159.   Levine admits that he felt like Westwood expected him, as a Field Admissions Representative, to try and sell a $75,000 education.

160.   Levine admits he understood that as a Field Admissions Representative at Westwood, he would be paid an annual salary.

161.   Levine admits he understood that he would be paid the same salary regardless of whether he worked more or less than 40 hours in any given week.

162.   Levine's employment as a Field Admissions Representative at Westwood ended in March 2010, which was before Westwood discontinued the use of retention and completion bonuses in October 2010.

**Nicholas Hruby**

163.   Nicholas Hruby ("Hruby") was employed by Alta Colleges, Inc. as a Field Admissions Representative from September 2, 2008 to October 6, 2011.

164.   Initially, Hruby was hired to work at Redstone College.  However, in August 2009, he transferred to work as a Field Admissions Representative at Westwood.

165.   When Hruby applied for employment as a Field Admissions Representative, his resume demonstrated prior sales experience.

166.   Hruby attended multiple training programs in Denver, Colorado.

167.   Hruby did not have an office on Westwood's campus, but rather worked in the field, including at high schools and in homes of prospective students.

168.   Hruby estimates that, with travel, he spent at least 60 percent of his time at high school presentations or conducting home interviews.

169.   During his employment at Westwood, Hruby was supervised by two different Directors of Admissions.  Hruby saw his supervisor only once every two to three months.

170.   As a Field Admission Representative, Hruby was assigned a specific territory in the Mountain Region, which included the mountain towns of Colorado.

171.   Hruby was responsible for generating his own leads, which he did through making high school presentations and collecting information cards from interested students.

172.   Before he could make high school presentations and generate leads, Hruby had to first make contacts at the schools with the administration and teachers so that he could schedule presentations.

173.   After booking the high school, Hruby gave a presentation, which included a discussion of the educational programs and services offered by Westwood.

174.    At the end of the presentation, Hruby asked students to fill out information cards, including information about their career interests and whether they wanted to be contacted about Westwood.

175.    The information cards Hruby collected were the leads he used to identify students who were potentially interested in attending Westwood.

176.    Hruby then called those students he identified as being interested in a program Westwood offered.

177.    The phone interview lasted no longer than 30 minutes and was an opportunity for Hruby to determine whether the student had a genuine interest in a Westwood program.

178.    Hruby testified that the goal of the phone interview was to schedule a home visit with a student, and his or her parent(s).

179.    At the home interview, Hruby met with the student and the student's parents for one to three hours to discuss the educational programs and services that Westwood offered.

180.    Hruby admits that barring a criminal history, he understood that if the student filled out the application, passed the assessment, had proof of graduation from high school, and had a means to pay for college (such as applying for and securing financial aid), the student was admitted.

181.    If, at the end of the home interview, Hruby determined that the student was genuinely interested in attending Westwood and the student concluded that Westwood would be a good fit, Hruby assisted the student in completing the application.

182.   Hruby testified that follow up in getting a student "start-ready" was a key responsibility for him as a Field Admissions Representative.  The only way that a student could become start-ready was to complete the enrollment completion process, which included testing, financial aid, and orientation activities.

183.   Hruby testified that he understood that it was important that his students were ready to start class at Westwood because if the student did not start, he assumed that no tuition was charged or paid.

184.   After obtaining an application from a prospective student, Hruby stayed in contact with the student, making follow up phone calls to remind the student about upcoming deadlines, inform the student if there were any missing documents or information and help locate the documents/information, and talk to the student about getting ready to start school.

185.   Hruby worked with his student applicants and the school departments to help set up appointments for testing and financial aid.

186.   If Hruby felt that a student applicant was wavering on their commitment to attend Westwood, he and the student would discuss the concerns.  Doing so helped Hruby increase the likelihood that the student would recommit and actually attend Westwood.

187.   Prior to the student starting class, Westwood held an orientation event on campus.  Hruby attended orientation so that he could be a friendly face on campus for his students and wish them good luck as they started school.

188.   As a Field Admissions Representative, Hruby received an annual salary.

43

189.    Hruby admits he understood that he would receive the same salary regardless of whether he worked more than 40 hours in a week or less than 40 hours in a week.

190.    Until the fall of 2010, in addition to his annual salary, Hruby was also eligible to receive bonuses based on retention and completion of students.  Hruby received one bonus while working at Westwood.

191.    Hruby testified that at certain point during his employment, the federal regulations governing the education industry changed such that he was no longer eligible for bonuses based on the retention and completion of students.

192.    Hruby admits that the change in federal regulations did not change his duties and responsibilities or the way he performed his job as a Field Admissions Representative.

**Michael Condensa**

193.    Condensa was employed by Westwood as a Field Admissions Representative from November 20, 2007 to on or about January 3, 2009, and again from February 1, 2010 until August 2, 2013.

194.    Condensa had prior sales experience required for the Field Admissions Representative position.  The application form he submitted to Westwood demonstrated his prior sales experience.

195.    Condensa understood that during the interview process, the primary purpose of the Field Admissions Representative position was to find qualified students to enroll at Westwood College.

196.    On or about November 20, 2007, Condensa received an offer for "the full-time exempt position of Field Admissions Representative" at a starting salary of $48,000.

197.    Westwood hired Condensa to work as a Field Admissions Representative in the Chicago, Illinois area.  Effective January 3, 2009, Condensa transferred to the position of Assistant Director of Admission for Westwood's Atlanta Northlake Campus. Condensa returned to the position of Field Admissions Representative on February 1, 2010.  Condensa testified that when he returned to the Field Admissions Representative position in February 2010, there were no differences in his job duties from when he previously worked as a Westwood Field Admissions Representative from November 2007 to December 2009.

198.    Shortly after he was hired as a Field Admissions Representative, Condensa attended a training program.

199.    Condensa admits he received training on the educational programs and services offered by Westwood and on topics related to fulfilling the duties as a Field Admissions Representative.

200.    Condensa received a copy of the Book of Knowledge shortly after he was hired, and the Book of Knowledge was referenced during his new-hire training.

201.    Condensa did not have an office on Westwood's campus, but rather worked in the field in high schools making presentations and in the homes of prospective Westwood students.

202.    Condensa and his supervisor, Director of Admissions Marvin Johnson, talked an average of every three or four days.

203.    As a Field Admissions Representative, Condensa admits he was assigned a specific territory and worked to enroll students for Westwood's Northlake and Midtown Atlanta campuses.

204.    Condensa was responsible for generating his own leads, which he did through making high school presentations and collecting Career Interest Cards from interested students.

205.    Before Condensa could make high school presentations and generate leads, he first had to book the high schools.  To do so, Condensa scheduled a meeting and attempted to develop a relationship with high school counselors and teachers. During the meeting, Condensa explained Westwood's programs and services, discussed his presentation, and asked for a time to make the presentation to high school students.

206.    After booking the high school, Condensa made his presentation to high school students.  During the presentation, Condensa talked about the educational programs and services offered by Westwood and highlighted the benefits of attending college at Westwood.

207.    At the end of the presentation, Condensa handed out Career Interest Cards and asked students to provide contact information if they were interested in obtaining more information about Westwood or its programs.

46

208.    Condensa admits that the Career Interest Card he collected after high school presentations were a source of his leads — students who were potentially interested in attending Westwood.

209.    Condensa called students whose Career Interest Cards indicated potential interest in Westwood to conduct a phone interview.

210.    Condensa's goal for the phone interview was to identify a prospective student who was genuinely interested in a Westwood program and to set up a home interview for that student.

211.    If, based on the phone interview, Condensa determined that the student was genuinely interested in Westwood, he scheduled a home interview.

212.    At the home interview, Condensa met with the student and his or her parent(s) to walk through Westwood's laptop presentation, provide additional information on Westwood's programs and services, answer questions, and provide information on the steps necessary to start school at Westwood.

213.    If, at the end of the home interview, Condensa determined that the student would be a good fit for Westwood and the student also concluded that Westwood would be a good fit, Condensa assisted the student in completing the application.

214.    Condensa admits his job as a Field Admissions Representative was not complete when he obtained a student application.  Condensa agreed that his primary role as a Field Admissions Representative was not only to selectively source, interview, and enroll prospective students into a qualified career-focused education, but also to guide the prospective student through the enrollment completion process.

47

215.    Condensa engaged in follow-up activities.

216.    After the student submitted an application and unless the student applicant earned a certain score on the ACT/SAT, Condensa contacted the student to ensure the student scheduled a time to take his or her assessment.  If a student was unable to come to Westwood's campus for the testing appointment, Condensa made arrangements for a proctor to administer the assessment off-campus.  If the student did not pass the assessment, Condensa contacted the student and worked to schedule another appointment for the student to retake the assessment.

217.    Condensa followed up with his student applicants to assist them in scheduling financial aid appointments.

218.    Condensa followed up to make sure that his student applicants scheduled a campus tour.  Often, Condensa was on campus to give the tour, but if he was not able to give the campus tour, he worked with the school department to set up a campus tour for the student.

219.    Condensa followed up with the student to ensure the education verification requirement was met and that Westwood had a copy of the student's transcript or proof of high school graduation.

220.    Condensa followed up with his students to let them know when they were eligible to register for classes, to provide information for the student to order books, to ensure the students attended orientation, called a "Day One Success Class," and to provide information on various scholarships.

221.    Throughout the enrollment completion process, Condensa worked with his students to identify and overcome potential concerns or obstacles.

222.    Even after his students started school at Westwood, Condensa continued to follow up to make sure that the student was attending class and to check in to see how classes were going.  Condensa typically was on campus the first two or three days of the term and followed up with students to see how classes were going.

223.    In his post-Westwood resume, Condensa described his position as a Field Admissions Representative at Westwood as "[o]utside sales" and explained that his "[d]uties include[d] the entire sales process from lead generation to close to follow up…."

224.    In November 2011, Condensa complained to Westwood about his manager pressuring him to hit the standards of performance.  In his internal complaint, after Condensa referenced Westwood's elimination of bonuses based on retention and completion of students, he stated "It's funny on how we are not supposed to be sales reps anymore to meet all of the legal compliances of the college and government regulations, but yet we are still managed as if we still are!"  Condensa complained that his manager would continuously ride Condensa about results.

225.    Condensa admits he understood that as a Field Admissions Representative he would be paid a salary.

226.    Condensa admits he understood that he would be paid his same salary regardless of whether he worked more than 40 hours in a week or less than 40 hours in a week.

49

227.    From February 1, 2010 to September 4, 2010, Condensa was paid an annual salary of $60,000.  From September 5, 2010 to December 31, 2011, Condensa received an annual salary of $62,500.  From January 1, 2012 to March 10, 2013, Condensa received an annual salary of $64,500.   From March 10, 2013 to the end of his employment on August 2, 2013, Condensa received an annual salary of $65,500.

228.    In addition to his salary, and until October 2010, Condensa was eligible for bonuses based on retention and completion of students.

229.    At a certain point during his employment, the federal regulations governing the education industry changed such that Condensa was no longer eligible for bonuses based on the retention and completion of students.  Accordingly, Condensa was transitioned to a fixed salary compensation plan.

230.    Condensa's salary was adjusted based on his 2009 and 2010 retention bonuses and to account for the number of student starts Westwood anticipated Condensa would have in 2011; accordingly, effective September 5, 2010, Condensa's salary was increased based on a $2,000 "Retention Salary."

231.    Condensa admits that performance standards required that he, as a Field Admissions Representative, successfully enroll approximately 25 to 35 students per year who actually began classes.

232.    Condensa was placed on probation effective August 14, 2012 based on his failure to meet the minimum expectations for a Field Admissions Representative regarding average appointments per week, interviews per week, test rate, class start rate, and number of school starts for the August term.

50

**Chaz Fortune**

233.    Chaz Fortune was employed by Westwood as a Field Admissions Representative from March 21, 2010 to February 14, 2012.

234.    On or about March 14, 2010, Fortune received an offer from Westwood for the "full-time exempt position of Field Admission Representative" at a starting salary of $40,000.

235.    Fortune admits that his job as a Field Admissions Representative was to selectively prospect, interview, recommend, and enroll individuals into a qualified career-focused Alta Colleges education and guide the prospect through the enrollment completion process.

236.    Shortly after Fortune was hired, he attended a new hire training program for Field Admissions Representatives and received the Book of Knowledge.

237.    Fortune also received training from his supervisor, Director of Admissions Marvin Johnson.

238.    Fortune did not have an office on Westwood's campus, but rather worked in the field, including at high schools and in homes of prospective students.

239.    During his employment as a Field Admissions Representative at Westwood, Fortune reported to Director of Admissions Marvin Johnson.

240.    Johnson observed one of Fortune's high school presentations, but otherwise never came out in the field to observe or supervise Fortune's work.  No other Westwood employee came out in the field to observe Fortune's work.

241.    Fortune saw his supervisor once or twice a month for an in-person team meeting.

242.    Fortune's supervisor had a weekly team conference call and a weekly one-on-one call with Fortune.

243.    Fortune admits it was up to him to determine his schedule and when he would make presentations in any particular high school and when he would conduct home interviews of prospective students.

244.    As a Field Admissions Representative, Fortune was assigned a specific territory in the South East High School Region that covered the Atlanta Public School System.

245.    Fortune generated leads by making high school presentations and collecting information cards from interested students.

246.    Fortune also received leads from Westwood and generated his own leads outside of the high school presentations.

247.    Before Fortune could make high school presentations and generate leads, he first had to book the high schools.  To do so, Fortune visited the high schools in his territory to develop a relationship with teachers, counselors, and administration.

248.    Fortune admits this was considered "territory management," which was something Fortune was evaluated on as a Field Admissions Representative.

249.    When Fortune met with the teachers, counselors, and administration, he explained how Westwood's programs and services could benefit their students,

discussed his presentation, and asked for a time to make the presentation to their students.

250.   After booking the high school, Fortune made his presentation to high school students.  During the presentation, Fortune discussed the benefits of a career-focused education and the educational programs and services offered by Westwood.

251.   At the end of the high school presentation, Fortune asked students to fill out Career Interest Cards within information about their career interests and whether they wanted to be contacted about Westwood.

252.   Fortune was responsible for developing the leads he generated from his high school presentations.  To do so, Fortune called the students at home to determine if the prospective student was interested in attending college at Westwood.  If so, Fortune asked to speak with the student's parents to schedule a home interview.

253.   At the home interview, Fortune met with the student and the student's parent(s) to walk through Westwood's laptop PowerPoint presentation.

254.   During the home interview, Fortune asked probing questions to learn about the student's interests and career goals and then explained how certain programs and services offered by Westwood matched the prospective student's needs.

255.   During the home interview, Fortune discussed the various benefits Westwood offers its students.

256.   If Fortune determined that the prospective student would be a good fit for Westwood, he assisted the student in completing the online application.

257.   Fortune testified that his primary objective as a Field Admissions

Representative was to find good and qualified candidates for Westwood who had the skills, desires and ability to graduate from college.

258.   Fortune agreed that his job as a Field Admissions Representative did not end with the student application.  Rather, he was required to follow up with prospective students through the enrollment completion process, which included ensuring that students took required admissions assessments, completed the financial aid process, and met their scheduled start date.

259.   As a Field Admissions Representative, Fortune was the main point of contact for his students throughout the enrollment completion process.

260.   Fortune engaged in follow-up activities.

261.   After the application was signed, Fortune followed up with student applicants to assist them in scheduling their assessments and financial aid appointments.  Fortune often met the student on campus at the time of the scheduled assessment and walked the student to the testing center to ensure that the student attended.  After the student finished testing, Fortune walked the student over to the financial aid department.  After the student completed their financial aid appointment, Fortune gave the student a campus tour.

262.   Prior to the start of classes, Fortune continued to follow up with his students by calling on a weekly basis to address any questions or concerns.

263.   On the first day of class, Fortune was on campus to greet his students and wish them good luck as they started school at Westwood.  If one of his students did not

show up for the first day of class, Fortune called to see why the student was not in class.

264.    Even after his students started class at Westwood, Fortune followed up to ensure that they doing well and to answer any questions or address any concerns.

265.    At all times as a Field Admissions Representative for Westwood, Fortune understood that he was being paid on a salary basis.

266.    At a certain point during Fortune's employment, federal regulations governing the education industry changed such that Fortune was no longer eligible for bonuses based on the retention and completion of students.  Accordingly, Westwood transitioned Fortune to a fixed salary compensation plan.

267.    When Westwood transitioned Field Admissions Representatives to a fixed salary, Fortune's salary was adjusted to account for the number of student starts Westwood anticipated Fortune would have in 2011 (two class starts).  Accordingly, effective September 5, 2010, Fortune's salary was increased by $1,700 as a "Retention Salary" and his total adjusted new salary was $44,000.

268.    From October 17, 2010 to the end of his employment on February 14, 2012, Fortune received an annual salary of $48,000.

269.    As a Field Admissions Representative, Fortune was measured and evaluated based in part on "start rate," meaning the number of his student applicants compared to the number who actually started school at Westwood.

270.    Fortune was measured and evaluated based on the number of student starts he secured per year.

55

271.   After Westwood eliminated incentive compensation in October 2010, Fortune continued to be evaluated based in part on his ability to secure student starts. For example, in his performance review dated January 9, 2012, Fortune was rated as "Needs Improvement" and his supervisor commented that he needed to improve his start rate because only a low percentage of the prospective students who submitted an application with Fortune actually started school at Westwood.  Fortune was also evaluated on his ability to identify prospective students who were committed to completing a degree and remaining in school and to effectively guide students through the enrollment completion process.  Fortune's supervisor noted that Fortune missed his start rate objectives for 2011.

**Rosalyn Grigsby**

272.   Rosalyn Grigsby was employed by Westwood as a Field Admissions Representative from August 10, 2009 to December 2, 2011.  However, on August 11, 2011, Grigsby began a medical leave of absence and did not actively work as a Field Admissions Representative at Westwood after that date.

273.   On or about July 21, 2009, Grigsby received an offer of employment for "the full-time exempt position" of Field Admissions Representative at a starting salary of $50,000 a year.

274.   Shortly after she was hired, Grigsby attended a new-hire training program in Denver, Colorado, on topics including lead development, territory management, and the nine-step interview process.

275.    In addition to her training program in Denver, Grigsby received additional training from her Director of Admissions, Beth Ann St. George.

276.    Shortly after being hired as a Field Admissions Representative, Grigsby received a copy of Westwood's Book of Knowledge.

277.    The Book of Knowledge was covered during Grigsby's training.

278.    Grigsby did not have an office on Westwood's campus, but rather worked in the field, including at high schools and in the homes of prospective students.

279.    Grigsby testified that it was up to her to determine what hours she would work on any particular day and no one told her what specific times of the day that she was required to be working as a Field Admissions Representative.

280.    From January 2010 to the end of her employment with Westwood, Grigsby was supervised by Director of Admissions Marvin Johnson.  Johnson and Grigsby spoke weekly by phone and/or e-mail.

281.    Johnson observed Grigsby conduct a high school presentation on one occasion and observed her interview a prospective student on another occasion.

282.    As a Field Admissions Representative, Grigsby was assigned a specific territory in the Southeast Region and was responsible for building and developing that territory.

283.    Grigsby understood that one of her roles as a Field Admissions Representative was to selectively prospect, interview, and recommend and enroll qualified individuals into a career-focused Westwood education.

284.    Grigsby also agreed that one of her job duties as a Field Admissions Representative was to find interested and qualified students to apply to Westwood and to assist those applicants through the enrollment completion process.

285.    Grigsby generated leads by making high school presentations and collecting Career Interest Cards from students interested in learning more about Westwood.

286.    Before Grigsby could make high school presentations, she first had to book the high schools.  To do so, Grigsby visited high schools in her territory to develop a relationship and network with counselors and teachers and asked to schedule a time to make her presentation to high school students.

287.    After booking the high school, Grigsby made her presentation to high school students, during which she discussed the programs and services offered by Westwood.  Grigsby hoped her passion for education would influence high school students to take action with respect to pursuing education in their own lives and she would present Westwood as an option for those students.

288.    At the end of the high school presentation, Grigsby handed out Career Interest Cards and asked students to provide contact information if they were interested in learning more about the programs Grigsby discussed.

289.    Within 24 hours, Grigsby followed up with a telephone interview to students who submitted a Career Interest Card.  If a student was interested in learning more about Westwood, Grigsby scheduled a home interview.

290.    At the home interview, Grigsby met with the student and his or her parent(s) to provide additional information on Westwood and the programs and services offered by Westwood.  Grigsby also provided information on the steps necessary to start school at Westwood.

291.    Grigsby used the home interview to determine if the student would be a good fit for Westwood.  To do so, Grigsby built a profile of the student by asking probing questions to discover the prospective student's interests and to determine whether the student's interests aligned with Westwood's programs and services.

292.    If, at the end of the home interview, Grigsby determined that the student would be a good fit for Westwood and the student agreed, Grigsby assisted the student in completing the online application for Westwood.

293.    Grigsby admits that her role as a Field Admissions Representative was not complete after she obtained an application from a prospective student.  She was expected to guide the prospective student through the enrollment completion process, which included following up to ensure that the student took the required admissions tests, completed the financial aid process with the financial aid department, and attended the scheduled class start date.

294.    Grigsby engaged in follow-up activities after the application was submitted in order to hold a student accountable to start school.

295.    Grigsby worked with her student applicants and the school departments to help set up appointments for testing and financial aid.  Grigsby followed up with her students to make sure they were present for their scheduled testing.

296.   Because many of Grigsby's students were located a distance from Westwood's campus and could not come to campus for their assessment.  Grigsby made arrangements to have a proctor administer their assessment at their high school campus.

297.   Grigsby also followed up with the financial aid department to check on how her students were progressing through the financial aid process.  If a student missed a scheduled financial aid appointment, Grigsby contacted the student to address any issues and to reschedule the appointment.

298.   Grigsby stayed in regular contact with her students even after they completed testing and financial aid so that she could address any questions or concerns that arose.

299.   If one of her students started to second guess his or her commitment during the enrollment completion process, Grigsby contacted the student to ask what challenges they might be facing and attempted to alleviate those challenges.  Grigsby reminded the student of the benefits of attending college.

300.   Grigsby followed up to schedule a time for her student applicants to come to Westwood and Grigsby would take the students on a campus tour.

301.   Grigsby made sure her students participated in orientation and attended orientation with her students.

302.   Grigsby was present on campus for her students' start date to greet the students, to make sure the process went smoothly, and to answer any questions.

303.    Even after all of Grigsby's follow-up activities and contacts with students through the testing, financial aid process, campus tour, and orientation, there were still some students who did not show up at class.  Grigsby followed up with those students with the hopes of getting them to start in another term.  Grigsby testified that she was able to get some of those students to come back and start school at Westwood in a later term.

304.    Grigsby testified she was expected to maintain relationships with her students while they were in school throughout their program of study.

305.    As a Field Admissions Representative, Grigsby received an annual salary, which was increased annually.

306.    Grigsby understood that she would receive the same salary regardless of whether she worked more than 40 hours in a week or less than 40 hours in a week.

307.    In addition to her salary, Grigsby received reimbursements for high school visits, home visits, and home revisits.  Specifically, Grigsby received $53 for each high school visit, $82 for each home interview, and $14 for each home revisit.

308.    Grigsby was also eligible to receive bonuses based on retention and completion of students.  Grigsby received bonuses based on her students attending Westwood and progressing through their academic programs.

309.    At a certain point during her employment, the federal regulations governing the education industry changed such that Grigsby was no longer eligible for bonuses based on the retention and completion of students.  Accordingly, Grigsby was transitioned to a fixed salary compensation plan.  Grigsby's salary was adjusted to

account for the number of student starts Westwood anticipated she would have in 2011 and her salary was increased based on a $2,750 "Retention Salary."

310.    Grigsby admits that the change in federal regulations did not change her job duties or the way she performed her job as a Field Admissions Representative.

311.    Grigsby's performance as a Field Admissions Representative was evaluated based on criteria, including the number of her student applicants who actually started school at Westwood.

312.    Grigsby admits that, as a Field Admissions Representative, she was expected to start a certain number of students for each class period throughout the year, with the largest number starting in August.

313.    Effective June 20, 2011, Grigsby was placed on probation based on her unacceptable performance in certain areas, including her average appointments per week, average interviews per week, average enrollments per week, average finalization rate, and her failure to meet the minimum acceptable start requirement in period two and three of 2011.

314.    Following a medical leave of absence, Westwood terminated Grisgby's employment for unsatisfactory performance.

**Michelle Jackson**

315.    Michelle Jackson was employed by Alta Colleges as a Field Admissions Representative from March 15, 2010 to November 5, 2012.

316.    Before applying for the position of Field Admissions Representative at Westwood, Jackson viewed a job posting on Westwood's website.

317.    Jackson admits that the Field Admissions Representative position she was applying for at Westwood could be categorized under sales.

318.    Jackson had experience in sales before applying to work at Westwood and she demonstrated that sales experience in the resume she submitted in applying to Westwood.

319.    During her interview, Jackson learned that the Field Admissions Representative position required that she develop relationships with teachers and administrators in high schools and conduct presentations to educate high school students on the benefits of attending Westwood.  Jackson learned that as a Field Admissions Representative, she would identify students who may be interested in attending Westwood and interview the student and the student's family to determine if the student would be a good fit for Westwood and if Westwood would be a good fit for the student's career goals.

320.    On February 26, 2010, Jackson received an offer for "the full-time exempt position of Field Admissions Representative" at a starting salary of $50,000 a year.

321.    Shortly after she was hired as a Field Admissions Representative, Jackson attended training in Arlington, Virginia, where she received and was trained on the Book of Knowledge.

322.    Jackson understood that the Book of Knowledge contained the tools she would need to perform her job.

323.    About a month after she was hired, Jackson received additional training during a four-day training class in Chicago, Illinois.

324.    During training, Jackson learned about Westwood's educational programs and services, the key responsibilities of a successful admissions representative, lead development, and territory management.

325.    Jackson was trained to recognize and reinforce an applicant's commitment when they came in to test, to register and every time she contacted the student to ensure that the student was moving forward in the enrollment completion process.

326.    Jackson admits that she was trained on using a series of commitments called "trial closes" during the interview process.  However, Jackson was encouraged by her director to not use such sales verbiage.

327.    Jackson described trial closes "in a sales environment" as asking particular questions to gauge whether or not a prospective buyer is interested in that item.

328.    Jackson was trained to overcome objections and admitted that it was her responsibility as a Field Admissions Representative to discover a student's potential challenges and provide options for overcoming them.

329.    Jackson did not have an office on Westwood's campus, but rather worked in the field, including at high schools and in the homes of prospective students.

330.    As a Field Admissions Representative, Jackson was assigned a specific territory in the Mid-Atlantic High School Region and she enrolled students for Westwood's Arlington campus and Annandale campus.

331.    Jackson testified that she generated Career Interest Cards by making high school presentations, which she admitted were a form of lead generation.  Before she could make high school presentations and generate leads, Jackson had to first make contacts at the school with the administration and teachers so that she could schedule presentations.

332.    After booking the high school, Jackson made her presentation, which included a discussion of the educational programs and services offered by Westwood and an explanation of the benefits of a Westwood education.

333.    Jackson testified that her presentation was guided by a company-provided PowerPoint but that the presentation was interactive; Jackson asked questions of the students and the student's responses would lead to additional interaction and conversation between Jackson and the students.

334.    At the end of the presentation, Jackson asked students to fill out Career Interest Cards, which asked for information on the student's career interests.

335.    Jackson called every student who submitted a Career Interest Card.

336.    By calling the students, Jackson tried to determine their goals, interests, and needs and whether the student had a genuine interest in attending Westwood; if Jackson felt that Westwood might fit their goals and needs, she presented the student with that option.

337.    If Jackson determined that the student was interested in a Westwood program, she asked to speak to the student's parents to schedule a home interview.

338.    At the home interview, Jackson met with the prospective student and his or her parent(s) or legal guardian for approximately 1-2 hours.

339.    At the home interview, Jackson discussed the student's post-high school educational goals and how Westwood's educational programs and services matched the prospective student's interests and goals.

340.    If Jackson determined that the student would be a good fit for Westwood, she explained to the student the benefits of attending college at Westwood and how Westwood met the student's needs and goals.

341.    Jackson admits that during the home interview she was matching the student's educational goals with a particular program offered by Westwood, which is known as "benefit selling" in a traditional sales environment.

342.    If, at the end of the home interview, Jackson determined that the prospective student would be a good match for Westwood, she assisted the student in completing the application.  Jackson testified that, other than her, no one at Westwood made a determination as to whether a prospective student was a good fit for Westwood's programs and services.

343.    Jackson testified that her job as a Field Admissions Representative did not end with the student application.  Rather, after assisting the student in completing the application, Jackson followed up with the student applicant to ensure the student was progressing through the enrollment completion process.

344.    Jackson followed up to set up an appointment for the student to complete testing for the entrance exam.  Jackson did not just set the exam appointment and hope

66

that the student attended; rather, Jackson met the student on campus at the scheduled time for the entrance exam.  If the student did not pass the entrance exam, Jackson advised the student of an opportunity to retake the exam and scheduled the retake.  If the student passed the entrance exams, Jackson scheduled an initial meeting with the student, parents, and the Westwood financial aid department.

345.   Jackson followed up to set up a meeting for the student with the registrar department to register for classes.

346.   Jackson followed up to ensure the student attended orientation, called Day One Success Class.  Jackson often attended the Day One Success Class with her student applicants.

347.   Jackson informed students of scholarship opportunities and assisted students in completing scholarship applications.

348.   Jackson was often on campus for her students' first day of class to offer encouragement and to answer questions or concerns.

349.   Throughout the enrollment completion process, Jackson communicated with student applicants and their parents to answer questions or concerns.

350.   Jackson agreed that the purpose of her follow-up activities was to make sure the prospective students were continuing through the enrollment completion process and would eventually start class and attend college at Westwood.

351.   Jackson agreed that Westwood wanted her, as a Field Admissions Representative, to enroll students that would start and complete the degree programs that Westwood offered.

352.   As a Field Admissions Representative, Jackson received an annual salary.

353.   Jackson admits that she understood she would receive the same salary regardless of whether she worked more than 40 hours in a week or less than 40 hours in a week.

354.   Jackson's starting annual salary as a Field Admissions Representative was $50,000.

355.   In addition to her annual salary, Jackson received a flat-rate "reimbursement" for each high school visit and each home visit she made.

356.   Jackson was eligible for bonuses based on the retention and completion of students.  At a certain point during her employment, the federal regulations governing the education industry changed such that Jackson was no longer eligible for bonuses based on the retention and completion of students.

357.   In October 2010, Jackson was transitioned to a fixed salary compensation plan.  At that time, Jackson's salary was adjusted to account for the number of student starts Westwood anticipated Jackson would have in 2011; accordingly, Jackson's salary was increased based on a $1,000 "Retention Salary."

358.   Jackson understood that she was expected to meet, and was evaluated on, standards of performance, including start rate.  The Standards of Performance identified certain numbers of enrollments per month that Field Admissions Representatives like Jackson were expected to achieve.  In addition, Jackson, as a

Field Admissions Representative, was expected to meet certain numbers for student starts for each class start period.

359.    Jackson admits that her job duties as a Field Admissions Representative did not change after the federal regulations changed in late 2010 and Westwood eliminated incentive compensation.

360.    After the federal regulations changed, Jackson admits that she continued to be evaluated based on the number of student starts she secured.

361.    Effective July 5, 2011, Jackson was placed on probation based in part on her failure to achieve the minimum student start requirements.  To avoid discharge, Jackson was required to secure a minimum of ten student starts for the August 2011 class period.

362.    In her post-Westwood resume, Jackson emphasized the sales aspects of her position as a Field Admissions Representative at Westwood.  Jackson stated that as a Field Admissions Representative, she "[e]xceeded [her] monthly enrollment budget and start goals first year with 45% start rate."

### Mikal Williams[4]

363.    Mikal Williams was employed by Westwood as a Field Admissions Representative from January 4, 2010 to August 5, 2011.

364.    During his interview for the Field Admissions Representative position, Williams was instructed on the position's duties and responsibilities.  Williams testified

---

[4]    Plaintiff Mikal Williams did not testify at trial, however, upon Plaintiffs' counsel's request, I received his deposition testimony as a trial exhibit.  Thus, after carefully reviewing Williams' deposition testimony, I make the following findings of fact.

that he was told he would be going into Washington, D.C. schools, and was expected to establish rapport with school principals, teachers, counselors, and other community organizations in order to identify students for Westwood.  Williams was told that he would be conducting high school presentations to generate interest in prospective students.  And from those prospective students, it would be up to him to determine which students were the best fits to recommend and enroll into Westwood's career-focused educational programs.

365.    Williams testified that during his interview to become a Field Admissions Representative at Westwood, he was told that his role would be influencing young adults to attend and graduate from Westwood.

366.    On or about December 18, 2009, Williams received an offer from Westwood for the "full-time exempt position of Field Admissions Representative" at a starting salary of $48,000.

367.    In early February 2010, Williams attended a one-week training program for Field Admissions Representatives in Denver, Colorado.  In that training, Williams learned about Westwood's educational programs and services and strategies for identifying potential students and determining whether they would be a good fit for Westwood.  Williams was trained on the high school presentation and the home interview, including the nine-step interview process.

368.    Williams was trained on generating leads.

369.   Williams was trained to tailor the home interview based on information he learned during the conversation to present information about particular programs he thought would interest the student or benefits to fit the student's needs.

370.   Williams received a copy of the Book of Knowledge.

371.   Williams did not have an office on Westwood's campus, but rather worked in the field, including at high schools and in homes of prospective students.

372.   As a Field Admissions Representative, Williams was assigned a specific territory in the Mid-Atlantic High School Region, which included the Washington, D.C. public schools as well as a limited number of schools in northern Virginia and Maryland. Williams was responsible for enrolling students for Westwood's Arlington Ballston and Annandale, Virginia campuses.

373.   Williams admits that the primary role of a Field Admissions Representative was to selectively prospect, interview, recommend and enroll individuals into a qualified career-focused Westwood program and guide the prospect through the enrollment completion process.

374.   Williams testified that he generated leads, which he called "prospective students," through making high school presentations and collecting information cards from interested students.

375.   Williams admits he received, was trained on, and used a "Top Ten Script" for his high school presentations.  As part of his presentation, Williams testified that he conveyed the message to students that education is a great investment in their future and that Westwood is a great place for them to reach their goals.

376.   During high school presentations, Williams discussed key Westwood differentiators such as: (1) a student could obtain a bachelor's degree in as little as three years; and (2) Westwood offered hands-on learning combined with relevant course work.

377.   At the end of the presentation, Williams asked students to fill out Career Interest Cards, including information about their career interests, which Westwood programs they may be interested in, and whether they wanted to be contacted about Westwood.

378.   Williams used the Career Interest Cards to generate leads or identify students who were potentially interested in attending Westwood.

379.   Williams testified that he obtained Representative Generated Leads ("RGLs") by asking for referrals during interviews of prospective students.

380.   Williams called students who filled out Career Interest Cards at his high school presentation.  The phone interview was an opportunity for Williams to determine whether the student had a genuine interest in applying to Westwood.

381.   If Williams determined that the student was truly interested in applying to Westwood and that the student would be a good fit for Westwood, he scheduled a home interview with the prospective student and the student's parents.

382.   At the home interview, Williams met with the prospective student and the student's parents — the decision makers and driving force on whether the student ultimately could attend Westwood.

383.    Williams admits that the prospective student's parents were considered the "buying committee."

384.    Williams admits that having the buying committee attend the home interview was critical to his success as a Field Admissions Representative because the buying committee could influence the prospective student to continue in the enrollment completion process at Westwood.

385.    Williams used the home interview to determine if the student would be a good fit for Westwood.  Based on the student's interests and goals, Williams discussed the particular programs Westwood offered that met the student's interests and needs.

386.    Williams also discussed with the prospective student and buying committee potential obstacles they saw to the student attending Westwood.  Williams provided information and options to overcome those obstacles.

387.    Williams admits that he used trial closes during the home interview to ensure commitment by the prospective student and the buying committee.

388.    Specific trial closes that Williams testified he used included "Do you see the benefits of a career focused education?" and "Do you see how Westwood is the place where you can succeed?"

389.    Throughout the home interview, Williams asked probing questions and used trial closes to check for the prospective student's and buying committee's time, financial, and emotional commitment to attending and graduating from Westwood.

390.    Williams testified that the length of the home interview depended on the conversation, how well the prospective student fit for Westwood, and Williams's

judgment and determination on whether the student would commit to apply to Westwood.

391.    If, at the end of the home interview, Williams felt that a student would be a good fit for Westwood, was likely to meet Westwood's admissions requirements, and he determined that the student and buying committee were committed to completing the enrollment completion process, he assisted the prospective student in completing the application.

392.    Williams testified that his goal as a Field Admissions Representative was not just to get an application, but to find a student committed to attending and graduating from Westwood.

393.    Williams understood the "enrollment completion process" to begin with the student's completion of the application that is extended by the Field Admissions Representative to the student.  After the application was completed, the student needed to complete the financial aid process with a financial aid counselor on campus.  From there, the student would visit student services to take an entrance academic exam. After the prospective student completed and passed the academic exam, the student was officially accepted into Westwood.

394.    After obtaining an application from a prospective student, Williams followed up to make sure the student continued through the enrollment completion process.

395.    Williams worked with his student applicants and the school departments to set up appointments for testing and financial aid and followed up with his students

thereafter.  Williams was always on campus to meet the student applicant at the time of the student's testing appointment.

396.    After setting up the initial financial aid and testing appointments, Williams continued to call his student applicants to touch base with them.

397.    Williams testified that he called students "to keep their excitement throughout the duration of the time between completion of the application and the start of school."

398.    Williams presented his student applicants with scholarship opportunities and followed up when the scholarship deadlines were approaching.

399.    Williams was involved in preregistration activities and attended day one success (orientation) with his students.

400.    Williams testified he would "absolutely" call his students to wish them good luck before their first day of class and would be present on campus for the student's first day.  In addition, Williams called his students after the first or second day of class to check in.

401.    Williams testified that as a Field Admissions Representative, he sought a certain level of commitment from prospective students in completing the enrollment process and starting school.

402.    Throughout the enrollment completion process, Williams worked with his students to identify potential obstacles to them starting class at Westwood and facilitated solutions to those obstacles.

403.    Williams understood that as a Field Admissions Representative at

Westwood, he would be paid an annual salary.

404.    Williams admits he understood that he would be paid the same salary regardless of the number of hours that he worked and regardless of whether he worked more than 40 hours in a week or less than 40 hours in a week.

405.    Williams testified that, as a Field Admissions Representative, he was measured and evaluated on various metrics that included the number of students interviewed, the number of applications, and the number of student starts for each of the five start dates in a calendar year.

406.    In his February 2010 performance review, Williams was evaluated based on his number of interviews, enrollments, and student starts.

407.    In October 2010, Williams was reviewed and his performance results were measured based in part on starts.

408.    In April 2011, Williams received a term review and his performance was measured in part on student starts, representative generated lead starts, and start rate.

409.    Williams admits that he was evaluated on his "start rate," meaning how many students of his actually started at Westwood versus the number of prospective students he reported.

410.    Effective June 8, 2011, Williams was placed on probation because he "continued to perform below the minimum expectations for an Admissions Representative."  Williams was informed that to avoid termination, he had to meet certain performance requirements related to the number of appointments, interviews, enrollments per week, and student starts for the August 2011 start period.

76

411.    Williams did not meet the expected number of student starts for the August 2011 start period, and Williams's employment was terminated.

**Trevor Cevene**[5]

412.    On October 17, 2011, Westwood hired Cevene as an Assistant Director of Admissions.  On or around April 16, 2012, Cevene was demoted to the position of Field Admissions Representative.

413.    Trevor Cevene was employed by Westwood as a Field Admissions Representative from on or about April 16, 2012 to January 1, 2013.

414.    Cevene had experience working in sales, which he demonstrated in the resume he submitted to Westwood.

415.    After he was hired, Cevene attended a one-week training program in Denver, Colorado.

416.    Cevene was provided a copy of the Book of Knowledge and was told to review it before attending training.  Cevene was informed that the Book of Knowledge was his primary resource for information and contained all of the tools he would need to perform his job.  In addition, the Book of Knowledge was covered in Cevene's training program.

417.    Cevene received training on tools to gain commitment from the prospective student to complete the enrollment completion process and start school.

---

[5]    Although Plaintiff Trevor Cevene was scheduled to testify via videoteleconference at trial, he failed to appear.  In fairness to Mr. Cevene, however, I carefully reviewed his deposition testimony, which was received as a trial exhibit, and I make the following findings of fact.

418.    He was trained to reinforce an applicant's commitment when the student came in to test, to register, and every other time he interacted with the student.

419.    Cevene also received training on topics such as five key responsibilities of the successful admissions representative, lead development, the nine-step interview process, identifying and overcoming student objections, trial closes, and benefits selling.

420.    Cevene did not have an office on Westwood's campus, but rather worked in the field, including at high schools and in homes of prospective students.

421.    Cevene admits that, as a Field Admissions Representative, he was assigned a specific territory in the Los Angeles, California area, and worked to enroll students at Westwood's Los Angeles Wilshire and Torrance campuses.

422.    Cevene was responsible for generating his own leads, which he did through making high school presentations and collecting information cards from interested students.  Cevene admits that his leads were information cards from students who may be interested in attending Westwood.

423.    Before Cevene could make high school presentations and generate leads, he first had to book the high schools.  To do so, Cevene contacted high school teachers who taught classes related to programs Westwood offered or who taught senior students and asked to schedule a presentation.

424.    After booking the high school, Cevene made his presentation, which included a description of the educational programs and services offered at Westwood.

425.    At the end of the presentation, Cevene asked students to fill out information cards, including whether they were interested in Westwood's programs and whether they wanted to be contacted about Westwood.

426.    Cevene did not call all of the students who submitted an information card. Instead, Cevene reviewed the information cards and called only those he determined might be interested in a program Westwood offered.

427.    Cevene's phone interview typically lasted less than ten minutes and was an opportunity for Cevene to determine whether the student had a genuine interest in a program Westwood offered.

428.    Cevene testified that the purpose of the phone interview was to schedule a home interview to meet with an interested prospective student and his or her parents.

429.    At the home interview, Cevene met with the prospective student and the student's parents — a group Cevene admits was referred to as the "buying committee" because they were the decision makers on whether the student ultimately could attend Westwood— for one and a half to two hours to discuss the educational programs and services that Westwood offered.

430.    Cevene admits that prospective students could be considered his customers.

431.    During the home interview, Cevene asked questions to determine the prospective student's interests and career goals and make sure the student was a good fit for Westwood's programs and services.

432.   Throughout the interview process, Cevene admits he used closes such as "Can you see how Westwood is the place where you can succeed?" to confirm the student's commitment to attending Westwood.

433.   During the home interview, Cevene identified potential hurdles that might prevent the prospective student from attending Westwood and provided information to attempt to resolve those hurdles.

434.   If Cevene determined that a student's educational needs and career interests matched with Westwood's programs and services, he assisted the student in completing the application.  There was no fee associated with submitting an application during the time that Cevene was a Field Admissions Representative.

435.   Cevene's job as a Field Admissions Representative was also to guide the prospective student through the enrollment completion process up to and including the start of classes.

436.   After obtaining a prospective student's application, Cevene stayed in contact with the student, making follow-up phone calls to remind the student about upcoming deadlines, inform the student about any missing documents or information and help get the missing documents/information on file, advise the student of scholarship opportunities and deadlines, make sure the student had registered and ordered books, and ensure the student actually started class at Westwood.

437.   Cevene worked with his student applicants and the school departments to help set up appointments for testing and financial aid.  After the scheduled appointment,

Cevene followed up with the student to make sure he or she attended the meeting and to answer questions.

438.    Cevene followed up with the students to make sure their educational verification requirement was satisfied.  If Westwood did not have a high school diploma or GED record on file for the student applicant, Cevene called or emailed the student to make sure the student provided a copy.

439.    Cevene testified that if the student applicant completed an interview with Cevene, passed the assessment, secured financial aid, and had their high school or GED diploma, the student was admitted to Westwood.  Cevene testified that his role as a Field Admissions Representative did not end when the student was admitted to Westwood.  Rather, Cevene continued to follow up with his students to make sure they registered for classes and got their books.  Cevene informed his students of scholarship opportunities and met his students on campus for orientation.  Cevene often emailed or texted his students on the first day of class or shortly thereafter to welcome them and answer any questions or concerns.

440.    As a Field Admissions Representative at Westwood, Cevene received an annual salary of $70,000.

441.    Cevene admits he understood that he would receive the same salary regardless of whether he worked more than 40 hours in a week.

442.    Cevene was evaluated based in part on his ability to "gain student commitment" and the number of student starts he secured.

443.    Cevene failed to achieve the minimum performance standards for Field

Admissions Representatives and, as a result, was placed on probation effective

November 12, 2012.  Cevene's probation was based on unacceptable performance in

certain areas, including the number of student starts he secured for the October and

August class start periods.  Cevene voluntarily left his employment at Westwood before

his probationary period ended.

## III.    CONCLUSIONS OF LAW

### A.    Overview of the Fair Labor Standards Act ("FLSA") Outside Sales Exemption

1.    The FLSA generally mandates that an employer pay an employee "a rate

not less than one and one-half times the regular rate at which he is employed" for hours

worked in excess of 40 per week, but exempts from overtime any person employed "in

the capacity of outside salesman."  29 U.S.C. §§ 207(a)(1), 213(a)(1).

2.    While the FLSA itself does not define the term "outside salesman," the

U.S. Department of Labor ("DOL") regulations define an outside salesperson as any

employee:

  a.    Whose primary duty is:  (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer;[6] and

---

[6]    An employee's "primary duty" is the "principal, main, major, or most important duty that the employee performs."  29 C.F.R. § 541.700.  The outside sales regulation provides:

  In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be

b.      Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.[7]

29 C.F.R. § 541.500(a).

3.      Section 3(k) of the FLSA establishes a broad, flexible definition of "sale," providing that "'[s]ale' or 'sell' *includes any* sale, exchange, contract to sell, consignment for sale, shipment for sale, or *other disposition*." 29 U.S.C. § 203(k) (emphasis added); *Christopher v. SmithKline Beecham Corp.*, ___ U.S. ___, 132 S. Ct. 2156, 2171 (2012) (noting that Congress "inten[ded] to define 'sale' in a broad manner" and that "other disposition" is "a broad catchall phrase"). The DOL's regulations reflect this expansive definition:

Sales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Section 3(k) of the Act states that "sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

29 C.F.R. § 541.501(b).

4.      The DOL has long instructed employers and courts to use a flexible, practical approach in determining if an employee is engaged in "sales," requiring only

_____

regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b).

[7]     The phrase "customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally or recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

that "the employee, *in some sense*, has made sales." *Preamble to 2004 Regulations*, 69 Fed. Reg. 22122-01, 22162-22163 (Apr. 23, 2004).

5.      The Supreme Court recently confirmed the use of a practical approach in determining whether an employee is engaged in sales under the FLSA, holding that the definition of an outside salesman "counsels in favor of a functional, rather than a formal, inquiry." *Christopher*, 132 S. Ct. at 2170.  Under such a functional approach, an employee is engaged in making sales if he obtains a commitment to buy, even if it is a "nonbinding commitment." *Id.* at 2172.  This functional and flexible definition recognizes the need to "view[] an employee's responsibilities in the context of the particular industry in which the employee works" and accommodates "industry-by-industry variations in methods of selling." *Id.* at 2170-2171.

### B.      Plaintiffs Were Exempt Outside Salesmen

6.      Although it is Westwood's burden to establish that Plaintiffs fall within the FLSA's outside sales exemption, "the ordinary burden of proof — preponderance of the evidence — controls the . . . evaluation of whether the facts establish an exemption to the FLSA." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1156, 1158 (10th Cir. 2012).

### i.      Plaintiffs Each Had a Primary Duty of Sales

7.      An employee's primary duty for purposes of the FLSA "is that which is of principal importance to the employer." *Reich v. State of Wyo.*, 993 F.2d 739, 742 (10th Cir. 1993); *Reyes v. Goya Foods, Inc.*, 2013 WL 6332984, at *1-2 (11th Cir. Dec. 6, 2013) (holding that an employer's expectations regarding an employee's job duties can

render the employee exempt, even if the employee did not perform the duties that made the job an outside sales position). Here, Westwood employed Plaintiffs as Field Admissions Representatives for the purpose of getting students to: enroll at Westwood; start school; and pay tuition.

8.      Determining whether an employee has a primary duty of sales requires a case-by-case analysis "with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). The required analysis should be "a functional, rather than a formal, inquiry" that "views an employee's responsibilities in the context of the particular industry in which the employee works" and "accommodate[s] industry-by-industry variations in method[s] of selling." *Christopher*, 132 S. Ct. at 2170-71.

9.      Under this standard, I find that Plaintiffs were making sales. From the time each Plaintiff first contacted the high school (and from the time Levine first contacted the student) until the time the student candidate actually started school at Westwood, Plaintiffs were engaging in various activities to secure the "sale," which was getting students to complete the enrollment process, attending Westwood's classes and paying tuition to Westwood. For example, Plaintiffs evaluated whether the prospect was likely to attend Westwood during both the phone interview and the home interview when educating the student and parent(s) on the benefits of a Westwood education and obtaining the application. Plaintiffs engaged in the stitch-in/follow-up process to ensure that the student was doing everything necessary to attend classes at Westwood (and ultimately pay tuition). Plaintiffs identified and worked to overcome obstacles that could prevent the student from starting class. Plaintiffs reconfirmed the student's commitment

to attend Westwood.  Plaintiffs met students on campus for orientation activities and on the first day of class to support and assist the students with any problems that arose.  In other words, I conclude that Plaintiffs were "selling" when doing whatever was necessary to ensure that the student started school at Westwood and then paid tuition.

10.     All of Plaintiffs' other activities, including time spent calling high schools to schedule meetings or presentations, reviewing Career Interest Cards, and completing weekly activity reports, whether performed in their home office or on the road, or anywhere else they chose to conduct business, fall within the outside sales exemption because they furthered their sales efforts.  *See Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 761-62 (W.D. Mich. 2003); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 551 (E.D. Mich. 2004) ("[F]ollowing up on contacts and leads generated during outside sales visits" is incidental to sales.).  I find that Plaintiffs performed these tasks to facilitate their high school presentations, home interviews, and follow-up work in order to achieve the ultimate goal of getting students to commit to pay tuition and attend Westwood.

11.     Other courts have held that the work performed by field admissions representatives in the for-profit education industry — the same position and work challenged here — constitutes sales.  For example, in *Nielsen*, 302 F. Supp. 2d at 747, DeVry, like Westwood, employed individuals as field admissions representatives whose job was to identify potential students, persuade them to apply, and follow through with them to ensure they ultimately began classes and paid tuition.  To do so, DeVry field representatives made presentations to high school students and collected career profile surveys to assess whether a student was likely to qualify for and be interested in

attending DeVry. *Id.* at 750.  Field representatives then began the process of pursuing individual prospects by calling the students at home and arranging a home interview with the student and his or her parent(s) — what DeVry called the "buying committee." *Id.* at 750-51.  If, based on the phone and home interviews the representative deemed the student a viable candidate and the student wanted to apply, the field representative assisted the student in completing an application and collected an application fee. *Id.* at 751.  Field representatives remained involved with potential students following their application in a process known as "stitching-in," whereby representatives contacted students to help with the preparation of financial aid paperwork and to ensure the applicants started classes and paid tuition. *Id.*  DeVry made admissions decisions based on strictly objective criteria, meaning that all students who held a high school diploma or GED and met DeVry's SAT/ACT requirements were automatically offered admission and students who lacked the required SAT/ACT scores had two chances to pass DeVry's college placement test. *Id.*  The court took a practical (rather than technical) approach to the outside sales exemption and concluded that the work performed by DeVry's field representatives "plainly and unmistakably satisfies the terms and spirit of the 'outside sales' exemption" because "field representatives performed the essential role in getting students to sign the enrollment agreement [and] [t]he relationship between field representative and student ended only when the student paid tuition and started school — the latest point at which the transaction between DeVry and the student can be said to have been consummated." *Id.* at 752, 760.

12.      Likewise, in *Cuvillier v. Alta Colleges, Inc.*, No. cv-02-935-GLT, 2003 WL 25742943 (C.D. Cal. Nov. 7, 2003), the Central District of California granted summary judgment for Alta Colleges, Inc. (the same parent company named as a Defendant in this case), holding that the work performed by its Field Admissions Representatives was sales.  Specifically, the *Cuvillier* court noted that "the product Alta sells is its educational program" and the Field Admissions Representative plaintiffs were "employed to enroll students in the school and ensure their continued enrollment and graduation — not just to make a one-time sale." *Id.* at *2.  The court also found the purpose of the Field Admissions Representatives' additional tasks — ensuring that students took the required admissions test and completed financial aid — to be furthering the purpose of the students' "continued enrollment and tuition payments." *Id.*  Accordingly, "[a]ll of [the field admissions representatives'] activities are sales, 'incidental to and in conjunction with' sales, and sales-related." *Id.*; *see Edwards v. Alta Colleges, Inc.*, No. 03-ca-0538OG(NN), 2005 WL 578333, at *7-8 (W.D. Tex. Jan. 28, 2005) (recognizing that the work activities of Alta Colleges Inc.'s Field Admissions Representatives were "virtually identical to those in *Nielsen*" and those duties constituted outside sales).

13.      The nature of Plaintiffs' job duties is "tantamount," in the for-profit education industry, "to a paradigmatic sale of a commodity." *Christopher*, 132 S.Ct. at 2171-2172.  "[I]t follows that [Plaintiffs] made sales for purposes of the FLSA and therefore are exempt outside salesmen under the DOL's regulations." *Id.* at 2172.  I find that the inherent sales nature of Plaintiffs' job means that they were engaged in sales.

14.     Accordingly, I conclude that in the for-profit education industry, Plaintiffs' work as Westwood Field Admissions Representatives constitutes sales.

### ii.     Plaintiffs Also Bore External Indicia of Salesmen

15.     In addition, Plaintiffs also bore "external indicia of salesmen," which "provides further support for [the] conclusion" that they were engaged in sales activities. *Christopher*, 132 S. Ct. at 2172 (addressing the external indicia of salesmen only after concluding that the work performed by pharmaceutical sales representative was "tantamount," in that particular industry, "to a paradigmatic sale of a commodity"); *Ruggeri v. Boehringer Ingelheim Pharm.*, 585 F. Supp. 2d 254, 266 (D. Conn. 2008) (noting that courts should look to the indicia of sales for additional support only after determining that the work performed by plaintiffs is exempt outside sales).

16.     Although the external indicia of sales are probative of whether work activities comprise sales, "[n]one of the indicia of sales-relatedness can be considered in isolation;" instead, the purpose and character of the job as a whole must be considered. *Nielsen*, 302 F. Supp. 2d at 756-57; *see Christopher*, 132 S. Ct. at 2172-73.

### a.     Plaintiffs Were Hired As Salespeople

17.     "An employee is more likely to be considered engaged in sales if the job was advertised as a sales position and the employee was recruited based on sales experience and abilities." *Nielsen*, 302 F. Supp. 2d at 756; *see Christopher*, 132 S. Ct. at 2172. In *Nielsen*, the court found this factor satisfied where DeVry posted available field representative positions in newspapers and on Internet sites under the "sales"

category, sought individuals with sales experience, and individuals seeking to be hired as field representatives mentioned their prior sales experience on their applications. 302 F. Supp. 2d at 756-57.

18.     Here, Westwood posted available Field Admissions Representative positions in local newspapers and on Internet sites under the "sales" category and sought individuals with sales experience, stating that qualified applicants for the position must have "[a]t least 1-3 years of outside sales experience."  *See Nielsen*, 302 F. Supp. 2d at 756-57 (concluding field admissions representatives were hired for their sales experience where the position was posted in newspapers and on Internet sites under the "sales" category and DeVry sought individuals with sales experience).

19.     Burke, Levine, Hruby, Cevene, Condensa, and Jackson all had the prior sales experience Westwood sought and each listed their sales experience in the resumes and applications they submitted to Westwood.  *See Nielsen*, 302 F. Supp. 2d at 756-57 (concluding plaintiffs filled sales positions where individuals seeking to be hired as field representatives mentioned their prior sales experience on their applications).  Accordingly, the fact that Westwood hired six out of seven Plaintiffs as salespeople provides further support that they were engaged in sales activities.

### b.     Plaintiffs Received Sales Training

20.     "Specialized sales training is another factor indicative of whether an employee is engaged in sales."  *Nielsen*, 302 F. Supp. 2d at 757; *see Christopher*, 132 S. Ct. at 2172-73.

21.     Plaintiffs each received training as Field Admissions Representatives during which they learned about Westwood's educational programs and service, territory management, lead development, overcoming objections from prospective students, and following up to ensure student applicants would start school at Westwood. *See Nielsen*, 302 F. Supp. 2d at 757 (field representative training that included learning about DeVry's educational programs and services, overcoming objections, territory management, finalization techniques, and following up on applicants to ensure they would start school at DeVry "reflect[ed] DeVry's efforts to train its field representatives in the art of sales").  Accordingly, here, I find that the training Plaintiffs received was specialized training, which further indicates that they were engaged in sales.

### c.     Plaintiffs Solicited New Business

22.     "Independently soliciting new business is another indicator of sales activity." *Nielsen*, 302 F. Supp. 2d at 758.  The *Nielsen* court found the field representatives independently solicited new business because whether or not field representatives encountered new prospects depended largely on their own, independent efforts.  *Id.*  Specifically, DeVry's field representatives were responsible for generating the majority of their own leads within their assigned territory by contacting high schools to build relationships, making presentations, and collecting information from students potentially interested in attending DeVry.  *Id.*

23.     Here, like the exempt field representatives in *Nielsen*, Plaintiffs were assigned territories, but within those territories they were responsible for generating the majority of their own leads (prospective students).  To do so, Plaintiffs contacted high

schools to build relationships with administrators and teachers and schedule

presentations.  Using the information from the Career Interest Cards, Plaintiffs followed

up with likely prospects, meeting with them and their parents at their home, obtaining

applications from appropriate students interested in attending Westwood, and then

following up with them to ensure they started school at Westwood.  In addition to the

leads Plaintiffs generated from their high school presentations, Plaintiffs were also

responsible for obtaining, and were evaluated based on their ability to obtain,

"representative generated leads" or "RGLs."

      24.    Because lead generation and development largely depended on their own,

independent efforts, I find that Plaintiffs solicited new business, which further indicates

they were engaged in sales.

### d.    Plaintiffs Worked With Minimal Supervision

      25.    "An employee who receives little or no direct or constant supervision in

carrying out daily work tasks is more likely to be considered engaged in sales."  *Nielsen*,

302 F. Supp. 2d at 758 (citing cases).

      26.    Plaintiffs each worked without direct or constant supervision in carrying

out their daily tasks and managed their own day-to-day activities.  *See Nielsen*, 302 F.

Supp. 2d at 758 (concluding field representatives worked with minimal supervision even

though they were provided handbooks containing scripts for speaking with prospective

students and detailing how to perform the job, were required to report to a supervisor on

a daily basis, and submitted detailed, regular reports, because they worked without

direct or constant supervision in carrying out their daily tasks).  Accordingly, I find that

Plaintiffs worked with minimal supervision, which further supports the conclusions that they were engaged in sales activities.

### e. Plaintiffs Compensation and Evaluations Reflect Their Sales Activities

27. Unlike other "white collar" exemptions under the FLSA, the outside sales exemption does not have a salary basis requirement or any other compensation level or type requirement. *See* 29 C.F.R. § 541.500(c).

28. In addition, neither the FLSA nor the DOL regulations require that an employee be paid commissions in order to be exempt as an outside salesperson. *Nielsen*, 302 F. Supp. 2d at 757.

29. In *Nielsen*, DeVry field representatives were paid a salary that increased or decreased based on performance objectives such as number of high schools booked and lectured, number of interviews per week, average application interview rate, number of applicants tested, and number of students who started classes, and DeVry recognized the top performing field representatives based on the number of tuition-paying student starts. *Id.* at 757. The court found such pay and rewards "reflected to at least some degree [field representatives] ability to accomplish what DeVry considers to be their most important task . . . putting students into DeVry classrooms." *Id.* at 757-58.

30. Here, Plaintiffs were each paid an annual salary and, until October 2010, their salaries could have been increased or decreased based on their achievement of performance objectives such as the number of high schools lectured per week, the number of interviews per week, the average application to interview rate, and the rate of students who actually started school at Westwood.

31.     In addition, before October 2010, Westwood's Field Admissions Representatives could earn a bonus based on students they enrolled progressing through their program of study.  Here, several Plaintiffs earned bonuses based on their students completing one or three academic years at Westwood.

32.     In October 2010, when Westwood discontinued the use of retention and completion bonuses in anticipation of revised federal regulations governing the compensation of admissions representatives, each Plaintiff received a transition letter showing how their current compensation would be translated into a revised salary, which included an increase based on a "Retention Salary" that took into consideration each Plaintiff's prior retention and completion bonuses and anticipated student starts for 2011.

33.     Plaintiffs admit that the change in federal regulations did not change their duties as Field Admission Representatives at Westwood.  In other words, it is clear that regardless of any change to the form of compensation for the Plaintiffs due to the change in regulations, the sales function of their job did not change, and their compensation — as well as continued employment — depended in part on their ability to persuade appropriate students to take classes at — and pay tuition to — Westwood.

34.     The Supreme Court has directed that the "unique regulatory environment" of the industry in which the employee works must be considered in evaluating the outside sales exemption.  *Christopher*, 132 S. Ct. at 2172.  And although compensation based wholly or in significant part on commissions often correlates with sales, where, as here, "an entire industry is constrained by law or regulation from selling its product in the

94

ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities." *Id.* at 1272 n.23.

35.     Even after late 2010, Plaintiffs continued to be evaluated based on their ability to secure student starts, including their start rate and the number of their student applicants who actually started school at Westwood.  Further, several Plaintiffs were placed on probation or discharged based in whole or in part on their failure to secure the minimum required number of student starts.  *See U.S. v. Silicon Valley Colleges et al.*, 262 F. App'x 810, 811-812 (9th Cir. 2008) (holding that the decision to fire an employee is not covered by the Higher Education Act or its regulations because termination is not a prohibited "commission, bonus, or other incentive payment").

36.     Plaintiffs were also eligible to receive various awards and recognition based in part on the number of student starts they secured and, prior to 2012, Field Admissions Representatives received a stipend for each high school presentation made and each admissions interview conducted.

37.     Plaintiffs' compensation, evaluations, and rewards "reflected to at least some degree their ability to accomplish what [Westwood] considers to be their most important task . . . putting students into [Westwood] classrooms."  *Nielsen*, 302 F. Supp. 2d at 757-58.

### iii.     Plaintiffs Were Customarily and Regularly Engaged Away From Westwood's Place of Business

38.     An employee who leaves the employer's place of business "one or two hours a day, one or two times a week, to engage in the selling or sales-related

activities" is "customarily and regularly engaged from the employer's place of business" for purposes of the outside sales exemption.  DOL Wage Hour Op. Ltr. FLSA 2007-2 (Jan. 25, 2007); 29 C.F.R. § 541.500; *see Nielson*, 302 F. Supp. 2d at 760-61.

39.     Plaintiffs were customarily and regularly engaged away from Westwood's campuses.  Each spent the majority of his or her time working away from Westwood's places of business and under minimal supervision.  They did not have offices at Westwood's campuses and worked in the field, including at high schools and in the homes of prospective Westwood students.  *Cuvillier*, 2003 WL 25742943, at *1 (stating that it is undisputed that Field Admissions Representatives for Alta Colleges, Inc. were regularly employed away from the employer's place of business); *Nielsen*, 302 F. Supp. 2d at 761 (concluding that field representatives customarily and regularly performed their work away from DeVry's place of business where they had no office on DeVry's campus and performed much of their work in the field at high schools and meeting with students in their homes).

40.     Finally, a finding that Plaintiffs were exempt outside sales employees promotes the spirit and purpose of that exemption, as explained by the Tenth Circuit:

> The reasons for excluding an outside salesman are fairly apparent.  Such salesmen, to a great extent, work individually.  There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.  In lieu of overtime, he ordinarily receives commissions as extra compensation.  He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day.  To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

*Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941).

41.     Here, I find that the *Jewel Tea* rationale applies with equal force to Plaintiffs, who worked autonomously in the field without punching a time clock or reporting hours worked to Westwood, earned a salary well above minimum wage, and performed work that was difficult to standardize to any time frame.

42.     I also find that the 2010 job description, found at Trial Exhibit 1, that listed the Westwood Field Admissions Representative position as nonexempt was a ministerial error on the part of Westwood and does not impact my analysis and ultimate conclusion that the Plaintiffs were employed for the purpose of regularly and customarily selling Westwood's educational programs away from Westwood's campuses.  I agree with the Western District of Tennessee's conclusion that "[w]hile the label of 'non-exempt' may be evidence that a position is not exempt, such a label is not dispositive. Instead the actual job duties and actions performed by the employee are dispositive." *Fields v. AOL Time Warner*, 261 F. Supp. 2d 971, 975 (W.D. Tenn. 2003).  Here, I conclude that the Plaintiffs' actual job duties and actions as Field Admissions Representatives were to conduct outside sales for Westwood College.

43.     Accordingly, based on my careful consideration of the facts and law applicable to this case, I find that Westwood has satisfied its burden and established that Plaintiffs fall within the FLSA's outside sales exemption.  I find that Plaintiffs were engaged in outside sales.  Thus, they are exempt from the overtime requirements of the FLSA.

IV.     **CONCLUSION AND ORDER OF JUDGMENT**

For the reasons stated in my findings of fact and conclusions of law, I find that the Plaintiffs were exempt from the overtime requirements of the Fair Labor Standards Act.  In accordance therewith, it is

ORDERED that judgment is entered against each named Plaintiff and in favor of Defendant Alta Colleges, Inc. d/b/a Westwood College.

Dated:  March 23, 2015

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge